JOSEPH GAMBINO, PLAINTIFF-APPELLANT, v. ROYAL GLOBE INSURANCE COMPANIES, DEFENDANT-RESPONDENT.

Argued November 18, 1980—Decided May 19, 1981.

*Bruce M. Schragger* argued the cause for appellant (*Schragger, Schragger & Lavine*, attorneys; *Nancy R. Lichtenstein*, on the brief).

*John A. Sakson* argued the cause for respondent (*Stark & Stark*, attorneys).

The opinion of the Court was delivered by

HANDLER, J.

This case, together with *Allstate Insurance Co. v. Skolny*, 86 *N.J.* 112 (1981), decided today, presents difficult issues of statutory construction involving New Jersey's personal injury protection (PIP) statute. The problem of ascertaining legislative intent in each case requires an assessment of the meaning of statutory phraseology in the light of the principles and policies which undergird the PIP statute. In this case the interpretative issue is posed in terms of whether the plaintiff-claimant, Joseph Gambino, was an "income producer," within the meaning of the PIP statute, *N.J.S.A.* 39:6A–2(d) and 39:6A–4(b), at the time he was injured and disabled in an automobile accident.

## I

The present case presents a rather straightforward factual setting. From September 1974 to May 1975, while acting as president of the Yellow Cab Company which he had owned for 16 years, Joseph Gambino attended college in order to acquire the educational qualifications needed to obtain an insurance broker's license. During the period of preparation for his new career, Gambino was in contact with the Raymond A. Marx Company, a seller of life insurance. It was contemplated that Gambino would join the company once he had passed his licensing exam and found a buyer for his small taxi business.

In June 1975 Gambino was licensed as an insurance broker and in late November 1975, he sold the Yellow Cab Company. It was arranged that he would commence his employment as a property-casualty broker with the Raymond A. Marx Company on January 15, 1976 at a salary of $500.00 semi-monthly. In the interim, Gambino continued as a consultant to the new owners of the taxi business until December 22 or 23, at which time he traveled to Florida for a vacation. He returned to New Jersey on January 5, 1976.

On January 13, 1976, two days before he was to start his new employment as an insurance broker, Gambino was seriously injured in an automobile accident and was unable to resume work for five months. Subsequently, he filed a claim with the defendant Royal Globe Insurance Companies (Royal Globe) for income continuation benefits, as provided for by his policy pursuant to *N.J.S.A.* 39:6A–4(b).[1] Royal Globe refused to pay income continuation benefits, claiming that the plaintiff was retired on January 13, and, therefore, ineligible to receive such recompense under the statute. Gambino then filed suit in the Superior Court, asserting entitlement to these PIP benefits.

---

[1] The plaintiff had, in fact, under the provisions of *N.J.S.A.* 39:6A–10, contracted for additional coverage above the minimum statutorily required amount of income continuation benefits.

The trial court granted summary judgment in favor of defendant on the ground that Gambino was not entitled to benefits under the terms of the statute, *N.J.S.A.* 39:6A–2(d), –4(b). An appeal was taken and this Court directly certified the case, pursuant to *R.* 2:12–2, while it was pending in the Appellate Division.

## II

The statute under which plaintiff claims benefits provides for "income continuation benefits" for "the payment of the loss of income of an income producer as a result of bodily injury disability." *N.J.S.A.* 39:6A–4(b). An "income producer" in turn is defined as "a person, who at the time of the accident causing personal injury or death, was in an occupational status, earning or producing income." *N.J.S.A.* 39:6A–2(d).[2]

Despite the assertions of defendant that the language of the statute is clear and unambiguous, the attempted literal application of the statute to the facts in this case suggests anomalous results, creating a need for statutory construction. Moreover, despite a surface clarity in the definition of the term "income producer," the statutory language is susceptible of more than a

---

[2]The framework for statutory coverage under *N.J.S.A.* 39:6A–4 is as follows:

> Every automobile liability insurance policy insuring an automobile as defined in this act against loss resulting from liability imposed by law for bodily injury, death and property damage sustained by any person arising out of ownership, operation, maintenance or use of an automobile shall provide additional coverage, as defined herein below . . . for the payment of benefits without regard to negligence, liability or fault of any kind, to the named insured and members of his family . . . "Additional coverage" means and includes:

> . . . . . . .

> b. Income continuation benefits. The payment of the loss of income of an income producer as a result of bodily injury disability, subject to a maximum weekly payment of $100.00, per week. Such sum shall be payable during the life of the injured person and shall be subject to an amount or limit of $5,200.00, on account of injury to any one person, in any one accident.

single and simple interpretation.[3]   The need for judicial inter-
pretation when confronted with such a statute was well describ-
ed by Chief Justice Vanderbilt in *Watt v. Mayor and Council of
Borough of Franklin*, 21 *N.J.* 274 (1956):

> As we move away from the ideal of a clear and unambiguous statute we find
> statutes that on their face are clear and unequivocal but in light of related
> legislation and of the surrounding facts and circumstances of the case in which it
> is applicable, the true meaning becomes indefinite or obscure.   In these instances
> it may be the plain meaning of the words themselves that casts doubt as to the
> true intention of the Legislature, or often it is the absurdity of the result
> flowing from a literal application of that plain meaning that causes wonder as to
> the true purpose of the enactment.   Then, too, there are those less difficult
> instances in which the meaning of a statute is obviously obscure or doubtful,
> where the language used is *per se* capable of dual interpretation.   When these
> circumstances appear the court is not only at liberty to interpret the statute but
> it is its solemn duty to seek out and give effect to the legislative intent evident
> from the aids available to it.   [21 *N.J.* at 277–278.]

We are thus enjoined, in this case, to ascertain the "true purpose
of the enactment" and, in this pursuit, the history of the
no-fault insurance law constitutes an important aid in illuminat-
ing and "giving effect to the legislative intent."

The no-fault automobile insurance statute (PIP) was enacted
by *L.* 1972, *c.* 70.   It "encompasse[d] the recommendations of the
Automobile Insurance Study Commission created under Joint
Resolution 4 of 1970."   *Sponsor's Statement to L. 1972, c. 70.*
The Commission believed that four major concerns must be
addressed by its legislative recommendations:

> (1) The prompt and efficient provision of benefits for all accident injury
> victims.   (The *Reparation* objective.)
>
> (2) The reduction or stabilization of the prices charged for automobile insur-
> ance.   (The *Cost* objective.)
>
> (3) The ready availability of insurance coverage necessary to the provision of
> accident benefits.   (The *Availability* objective.)

---

[3]Lower court cases have taken different approaches in ascertaining the
meaning of the statutory phraseology "in an occupational status, earning or
producing income" and are presently divided on the issue of whether one
injured while in a temporary hiatus from employment is "an income produc-
er" eligible to collect income continuation benefits.   Compare, *e. g., Miller v.
Ohio Cas. Group*, 177 *N.J.Super.* 328 (Law Div. 1980) and *Hunter v. Hartford
Accident and Indemnity Co.*, 155 *N.J.Super.* 16 (Law Div. 1977) with *Richburg
v. Selected Risks Insurance Co.*, 147 *N.J.Super.* 401 (Law Div. 1977).

(4) The streamlining of the judicial procedures involved in third-party claims. (The *Judicial* objective.)

[Automobile Insurance Study Commission, *Reparation Reform for New Jersey Motorists* at 7 (December 1971) (hereinafter *Commission Report*)]

Of particular importance for our purposes are the reparation and judicial objectives.

The reparation objective was viewed as the "primary purpose of an automobile insurance system" and was given "priority" by the Commission in formulating the proposals which served as the basis for the PIP statute, *N.J.S.A.* 39:6A–1 *et seq. Commission Report, supra,* at 41. In short, the goal of the legislation in this regard is "[t]o maximize the flow of individual losses into payable claims . . .," *id.* at 24, and "to provide an equitable and uniform schedule of benefits for all victims." *Id.* at 50. The failure of many automobile accident victims to receive any, or adequate, reimbursement for their injuries was considered a major deficiency in the tort liability system that existed prior to the institution of the no-fault law and an unwarranted hardship upon unfortunate victims. *Id.* at 9–11. See also *Public Hearings before Commission to Study Certain Automobile Insurance Matters,* Vol. 1 at 53, 71, 13A, 30A, 46A (March 30, 1971), Vol. 2 at 3, 121 (April 14, 1971), Vol. 3 at 222 (April 21, 1971) (hereinafter *Public Hearings*). It was believed that once the law became effective, this problem would be alleviated and "victims of accidents involved in private passenger cars will be assured of obtaining prompt compensation for all their economic losses . . . ." *Press Release from the Office of the Governor,* June 20, 1972. The courts have repeatedly recognized the importance of interpreting the Act so as to realize this goal, finding force in the statutory mandate that the Act be liberally construed so as to effectuate its purposes. *N.J.S.A.* 39:6A–16. *Amiano v. Ohio Casualty Ins. Co.,* 85 *N.J.* 85, 90 (1981) ("PIP coverage should be given the broadest application consistent with the statutory language"); accord, *Motor Club of America Ins. Co. v. Phillips,* 66 *N.J.* 277, 293 (1974); *Brokenbaugh v. N.J. Manufacturers Ins. Co.,* 158 *N.J.Super.* 424, 429 (App.Div.1978); see *Service Armament Co. v. Hyland,* 70 *N.J.* 550, 559 (1976) (where the purpose

of legislation is "remedial and humanitarian", any exception to its coverage must be "narrowly construed" consistent with that purpose and "the plain meaning of the language").

The other important goal of the no-fault reforms that must be considered is the judicial objective. The legislation, in this regard, was designed "to minimize the workload placed upon the courts by enabling losses to pass into claims ... with a minimum of judicial intermediation." *Commission Report, supra*, at 24. The problem of long delays in obtaining compensation was perceived as the primary flaw in the previous system which encouraged recourse to and reliance upon the judiciary to adjudicate liability based upon the fault of the parties involved. *Id.* at 99–100. The testimony before the Committee was replete with complaints about the hardships incurred by accident victims due to the lengthy passage of time between injury and recovery that far too often occurred under the old system.[4] *Public Hearings, supra*, Vol. 1 at 29, 47, 53–54, 73, 5A, 13A, 30A, 46A, Vol. 2 at 3, 88, 122–123, Vol. 3 at 223, Vol. 4 at 43, 73, 82–83 (April 30, 1971).

■ In interpreting the statute to give full effect to the legislative intent, then, the statutory language must be read, whenever possible, to promote *prompt* payment to *all* injured persons for *all* of their losses. Consequently, approaches which minimize resort to the judicial process, or at least do not increase reliance upon the judiciary, are strongly to be favored. See *Amiano v. Ohio Casualty Ins. Co., supra*, 85 *N.J.* at 90 ("The No Fault Act is social legislation intended to provide insureds with the prompt payment of medical bills, lost wages and other such expenses without making them await the outcome of protracted

---

[4]This was perhaps stated most cogently, *viz.*,

the system has resulted in the denial of substantial and equal justice to seriously injured accident victims who are unable to withstand the financial burdens consequent upon long court delays and who are, therefore, forced into inadequate settlements of their claims. [*Public Hearings, supra*, Vol. 1 at 54.]

litigation"). *Cf. Aetna Insurance Co. v. Gilchrist Bros.*, 85 *N.J.* 550, 565 (1981) (eliminating insurer subrogation rights serves to effectuate the "fast and efficient reimbursement of the medical expenses of all injured persons" and saves "administrative costs, including counsel fees"). As previously noted, the Act's provisions and language must be liberally construed to effectuate these purposes of the Act. *N.J.S.A.* 39:6A–16.

## III

The dispute in this case concerns whether Gambino was "in an occupational status, earning and producing income" (*N.J.S.A.* 39:6A–2(d)), when he was injured in the automobile accident on January 13, 1976. The trial court interpreted *N.J.S.A.* 39:6A–2(d) to require that two separate criteria for compensation be met before a person may receive recompense as an "income producer"—that the injured person be, at the time of the accident, both "in an occupational status" and "earning and producing income." It found that Gambino, although in an occupational status, was not earning or producing income on the date of the accident and, thus, was not an "income producer" within the statutory definition of that term and therefore ineligible for benefits.

We differ from the trial court's conceptualization of the statutory term "income producer." To achieve the essential fairness intended by the Act, without encouraging, contrary to legislative intent, a new wave of litigation in the courts over the definition of terms, we opt for a bright line interpretation of the statutory provision in question, one that will serve to maximize prompt recovery as mandated by the Act yet, at the same time, diminish the need for litigation. Consistent with the essential purpose of the Act, we believe that the phrase "occupational status, earning or producing income" was meant to be considered as a linguistic and conceptual whole—a singular or holistic requirement that must be met by a claimant in order to be classified as an "income producer." Rather than myopically

focusing upon isolated segments of a person's existence or the details of an artificial and unnaturally narrow "slice of life" in order to determine if that person has, on a particular day, produced income, the status or position of the individual must be viewed with a wide-angle lens that looks at the entire life role as it would be perceived by a person familiar with the individual's pattern of living "as of the date of the accident." *Cf. Rybeck v. Rybeck*, 141 *N.J.Super.* 481, 500 (Law Div. 1976), app. dism. 150 *N.J.Super.* 151 (App.Div.1977).

■ Accordingly, we hold that recovery is available to those persons who, as part of their normal and prevailing way of life are gainfully engaged in work that generates income, but are foreclosed from such normal endeavors or preempted from that usual status because of injuries incurred in an automobile accident. *Cf. Campbell Soup Co. v. Div. of Employment Security*, 13 *N.J.* 431, 435 (1953) ("[unemployment compensation] act is designed to provide . . . compensation for workers who ordinarily have been workers and would be workers now but for their inability to find suitable jobs").

■ Within this definitional framework, all persons meaningfully and concretely engaged in or committed to an occupational way of life, one that regularly and normally involves working for pay, would be "income producer[s]" entitled to benefits under the law. The timing or coincidence of the disabling automobile accident in relation to the victim's normal work routine, schedule or habits can, under this construct, be viewed in a realistic and sensible perspective. Eligibility as "income producer" would attach not only to regularly employed persons injured in automobile accidents during their daily or regular periods of work but would apply as well to employed persons injured over a nonworking weekend, or on an authorized, unpaid sick or vacation day, or on a leave of absence without a real permanent break in employment.

■ This concept of "income producer" would also encompass individuals such as plaintiff here, who have affirmatively made

actual arrangements so as to ensure that they will be employed for remuneration at some time in the near future. See *Miller v. The Ohio Cas. Group,* 177 *N.J.Super.* 328, 332–333 (Law Div. 1980); *Hunter v. Hartford Accident and Indemnity Co.,* 155 *N.J.Super.* 16, 22–23 (Law Div. 1977); *cf. Clay v. N.J. Special Joint Underwriting Assn.,* 160 *N.J.Super.* 188 (App.Div.1978) (individual receiving unemployment compensation benefits is an income producer); M. Iavicoli, *No Fault & Comparative Negligence in New Jersey* 52–53 (1973) (Act was intended to include as income producers those who have been temporarily laid-off but are to return to work at some date after the accident).

■ Contrariwise, those individuals who, either by choice or disability unrelated to the accident, would not have desired or been capable of employment even if they had not been injured, may not recover. The completely retired, the unemployable and those who have never been or planned to be a part of the workforce or have permanently removed themselves from the ranks of the gainfully employed are excluded from coverage. See *Hunter v. Hartford Accident and Indemnity Co., supra,* 155 *N.J.Super.* at 22. Moreover, those who perform "work" as nonpaid volunteers are not eligible to receive income continuation benefits. *Cf. Southeastern Fidelity Ins. Co. v. Hicks,* 143 *Ga.App.* 165, 237 *S.E.2d* 655 (1977) (daughter who worked as a cashier at a restaurant merely as an accommodation to her mother and received no pay is not eligible for insurance benefits).

In our view, this approach is most solicitous of the legislative intent in that it provides comprehensive protection on an equitable basis to all who have lost income that they would have had were it not for their accident, *cf. Greenberg v. Great American Insurance Co.,* 158 *N.J.Super.* 223 (App.Div.1978), aff'd o. b. 79 *N.J.* 399 (1979) (income continuation benefits to be paid are measured by the difference between the amount that the claimant would have earned if not injured and the income actually received); and, it does so in a way consistent with the legislative

desire that the functioning of the statute be simplified so as to minimize resort to judicial mediation and maximize prompt recompense to a claimant.

## IV

█ The final step in our analysis is the application of the articulated standards to the dilemma presented by Joseph Gambino's temporary hiatus from work.

Royal Globe has asserted that Gambino was "retired" from the workforce from mid-December until mid-January, and, therefore, should not be eligible to recover income continuation benefits. While we endorse the view that totally retired individuals may not recover such benefits (*Ante* at 110), such a revisionist definition of what constitutes retirement, as proffered by Royal Globe, is contrary to the spirit and common sense of the statutory scheme and cannot withstand our disposition today. One who has taken a vacation in the brief interim between two jobs, as in this case, is in a status not substantially different from a person who is away from his job over a weekend or on vacation or leave of absence.

Gambino clearly falls within that class of insureds who should receive income continuation benefits upon suffering a disabling accident. An essential dimension of Gambino's normal status in life includes gainful employment and the production of income and, indeed, at the time of the accident, the plaintiff had a firm commitment for such employment at a definite wage. The salient objective of the legislation—to provide PIP benefits that will reimburse all victims for the full extent of their losses—would be frustrated, if not defeated, were we to indulge in the parsimonious reading of the clause "income producer" suggested by the defendant. That reading would improperly exclude from coverage those who have taken temporary leave from work, but have a firm commitment to commence employment in the fu-

ture—a commitment that is not met only because of the unfortunate supervening fortuity of an automobile accident.[5]

We, accordingly, conclude that Joseph Gambino is an income producer for the purposes of *N.J.S.A.* 39:6A–4(b) in that he was in "an occupational status, earning or producing income" at the time of the accident. The Law Division judgment is reversed and the case is remanded for further proceedings consistent with this opinion.

*For reversal and remandment*—Chief Justice WILENTZ and Justices SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER, HANDLER and POLLOCK—7.

*For affirmance*—None.

---

[5]The weight of out-of-state cases, although admittedly construing different statutes, would allow income replacement benefits to be paid in circumstances similar to those which confront this Court. See *Morgan v. State Farm Mut. Auto. Ins. Co.*, 5 *Kan.App.*2d 135, 613 *P.*2d 684 (1980); *Kennedy v. Auto-Owners Ins. Co.*, 87 *Mich.App.* 93, 273 *N.W.*2d 599 (1978); *cf. State Farm Mut. Auto. Ins.Jv. Brooks*, 101 *Misc.*2d 704, 421 *N.Y.S.*2d 1010 (Sup.Ct. 1979); but see *State Farm Mut. Ins. Co. v. Moss*, 152 *Ga.App.* 84, 262 *S.E.*2d 248 (1979); *Sheffield v. Cotton States Mut. Ins. Co.*, 141 *Ga.App.* 861, 234 *S.E.*2d 695 (1977).