557 A.2d 262

**William L. MARTIN, et ux.**

v.

**NATIONWIDE MUTUAL INSURANCE CO., et al.**

**No. 1313, Sept. Term, 1988.**

Court of Special Appeals of Maryland.

May 3, 1989.

John R. Foran (Horowitz and Foran, on the brief), Greenbelt, for appellants.

Mary S. Akerley (Sasscer, Clagett, Channing & Bucher, on the brief), Upper Marlboro, for appellees.

Argued before WILNER, WENNER and FISCHER, JJ.

WILNER, Judge.

Md.Code Ann. art. 48A, § 539(a) requires every automobile insurance policy sold in Maryland to provide up to $2,500 in benefits for medical expenses and "loss of income" as the result of an accident. These are "first party" benefits, payable by the insurer to its insured(s) without regard to who was at fault in the accident, and are commonly referred to as PIP (Personal Injury Protection) benefits.

Section 541(b) of art. 48A specifically allows parties to contract for PIP coverage in excess of this mandatory minimum, if they choose to do so. In 1984 or 1985, Grace and William Martin opted to purchase such additional coverage from their insurer—Nationwide Mutual Insurance Co. In a policy issued at that time and renewed periodically thereafter, Nationwide agreed to provide up to $50,000 in benefits for medical expenses and loss of income. The latter obligation was expressed thusly:

"**INCOME CONTINUATION** If the insured was earning income from an occupation at the time of the accident, we

will pay for loss of gross income incurred within three years after the accident."

Mr. Martin seems to have had a somewhat varied and imprecise employment background. He claimed to hold, or to have held, a real estate license, a builder's license, a "banker/broker's" license, a home improvement license, and "teaching certificates" from a community college and a vocational-technical school. "My employment background," he said, "has been mainly all in construction ... construction design. In my very younger years it was in design and highways, bridges, buildings. And then it went into construction. And I built just about everything there is." Although he claimed to have made as much as a half a million dollars a year in years prior to 1987, he could not recall the highest amount reported on his tax returns. The only returns he was able to produce—for 1986 and 1987—showed that he had no taxable income whatever in either of those years. His 1986 tax return showed gross receipts from his construction business of $4,752 and expenses of $45,505, for a net loss of $40,753. He claimed that he sold this business—Marvex Corporation—in November, 1986, to one Larry Bird for $150,000. He conceded, however, that he never received any of that money because Mr. Bird immediately went bankrupt.

In November, 1986—just after the sale of his business to Mr. Bird—Mr. Martin made an arrangement with a company known as Front Desk Enterprises, owned by one Jay Williams. This eventually ripened into two agreements, both drafted by Mr. Martin.

Front Desk Enterprises was supposed to be a certified minority business contractor, although it appears that it was never actually certified. According to Mr. Martin, on cross-examination, Mr. Williams "did not have an official license, but they gave him some kind of semi-approval, or something like this." Mr. Martin's employment by the firm doubled its staff: the company consisted entirely of Mr. Williams and Mr. Martin; there was not even a secretary. The first agreement was dated November 19, 1986, and,

according to Mr. Martin, was to last only six months. Under this agreement, Mr. Williams hired Mr. Martin as a "Project Manager" and agreed to pay him $87,000, as follows:

"1. $15,000.00 before start of job (good faith monies).

2. $72,000.00, Project Manager will be compensated at the rate of $3,000.00 per week after taxes out of the proceeds of construction project with the balance due on completion of job.

3. As incentive, contractor agrees to pay Project Manager ⅓ of the total gross change order amount paid on approval of each such change order."

For this, Mr. Martin agreed to "spend as many hours as he deems necessary on the job."

It is not entirely clear what, if any, work Martin did under this agreement; it *is* clear that he never received any money from Front Desk—not even the $15,000 "good faith monies." In December, the agreement was replaced with a more permanent and ambitious one. Under that agreement, Martin was employed for a three-year period, commencing January 5, 1987, as "Chief Executive Officer/V.P. of Construction." This agreement also obligated him to "spend as many hours as he deems necessary on the job" (subject to three weeks vacation and all Federal holidays), for which:

"5. The contractor agrees to pay the Chief Executive Officer/V.P. Construction as follows:

1. $3,000.00 per week salary after taxes (paid weekly).

2. As an incentive, 15% of the gross profits each job paid upon the completion of each job.

3. As bonus, ⅓ of the total gross change order, amount paid on approval of each such change order.

4. Blue Cross, Blue Shield family policy, major medical with dreaded disease coverage.

5. Disability policy based on salary and position.

6. Contractor agrees to re-emburse [sic] Chief Executive Officer/V.P. Construction for all travel, business,

and vehicle expenses relative to the due course of business." [1]

Mr. Martin entered upon his duties on January 5, 1987, and, according to him, procured a number of significant contracts for Front Desk, among which were a $700,000+ drywall and painting subcontract on the "U.S. Pension Building" and a "total revamp" contract for the Gelman Library of the George Washington University. He also bid contracts for work at the District of Columbia courthouse and "several schools."

On March 5, 1987, Mr. Martin was involved in an automobile accident. Thereafter, he submitted a claim to Nationwide seeking the full $50,000 in PIP coverage. He also submitted forms indicating that, as a result of the accident, he (1) suffered disabling back injuries that prevented him from working for an indefinite period of time, (2) incurred medical expenses of an unspecified amount, and (3) lost his salary of $3,000 a week, after taxes, from his job as Vice President of Construction for Front Desk Enterprises.

Nationwide paid all of Mr. Martin's medical expenses, which eventually totaled $10,788.53. It also advanced $3,000 to the Martins upon their attorney's representation that they were experiencing severe financial difficulties, while it investigated the claim for lost wages. When its investigation failed to satisfy Nationwide that Mr. Martin had incurred any real "loss of gross income," however, it refused to pay any more on the claim. The Martins thereupon filed suit against Nationwide in the Circuit Court for Anne Arundel County for breach of contract (Count 1) and bad faith failure to pay a first-party claim (Count 2).

The crux of the problem was that, despite his very favorable agreement, Mr. Martin never actually received any money from Front Desk, or from Mr. Williams. He did,

---

1. According to payroll statements allegedly issued by Front Desk, Mr. Martin's gross salary was actually $6,400/week, from which $3,400 in taxes and FICA contributions were deducted, leaving a net weekly salary of $3,000.

in fact, receive a series of 11 checks from Front Desk, each for $3,000, but, at Mr. Williams' request, he did not deposit the checks until March 26, 1987, at which time they were all returned with the notation "Account Closed." Indeed, Mr. Martin acknowledged that the checks were no good when received and would not be good unless and until Front Desk received some money from its contracts.[2] That never happened; in fact, in late March, Front Desk's subcontract on the "U.S. Pension Building" was cancelled, following which the company went out of business.

Mr. Martin readily conceded that he never received any money at all from Front Desk, and that he never would receive any money from that company in the future. His entire income for 1987, as reported on his State and Federal tax returns, was $375. His position, nevertheless, was that he was entitled to the $3,000/week from Front Desk by virtue of the agreement and that he therefore "earned" that money. As he put it:

"My income was unable to be paid by Front Desk, even though earned, because it did not receive required payments under the contracts. In spite of this, I am entitled to receive the sum of those pay checks which I received but was unable to cash, as well as such additional payments I would have been entitled to during my disability."

Both parties moved for summary judgment—the Martins on Count 1, Nationwide on Count 2. Both motions were granted by Judge Heise on July 20, 1988—the day before scheduled trial. Although the Martins initially complained about the granting of summary judgment for Nationwide on Count 2, they abandoned that complaint at oral argu-

---

2. There is some question as to when these checks were actually written. They are dated, respectively, January 12, 17, 27, and 31, February 10, 12, 20, and 27, and March 6, 14, and 21, 1987. They have nearly consecutive numbers, however—424, 425, 428, 429, 430, 431, 432, 434, 435, 439, and 441—which is unusual for an operating business, given the 2½ month time span. Even more unusual is the fact that No. 431 (February 10) was dated two days before No. 430 (February 12).

ment before us. The summary judgment entered on Count 1 was a "partial" summary judgment, intending to resolve only the issue of liability. In granting the motion, Judge Heise noted that Mr. Martin had, by affidavit, claimed that he was "earning" income at the time of the accident, and that Nationwide had not filed any affidavit to the contrary.[3]

Trial was held, as scheduled, the next day before Judge Lerner. Mr. Martin testified; the agreements, the payroll checks, and his 1986 and 1987 tax returns were placed into evidence. Based on this evidence, Judge Lerner concluded:

"I did not hear the case as to liability, and consequently, I cannot reverse the decision of Judge Heise, but I don't find that [the Martins are] entitled to any damages, whatsoever. It is incredible that a man who was not earning very much money or shows anything with regard to his income tax returns would all of a sudden be earning three hundred and thirty thousand dollars plus all this other money and percentages, and I think it just seems to me that these checks were held and that it just was not demonstrated to this member of the court that he has complied with the terms of this policy. Consequently, the court previously having entered a judgment on liability, the court will enter a judgment in favor of the plaintiff against the defendant for one dollar plus costs."

In this appeal, the Martins argue:

---

**3.** The colloquy leading up to this decision was as follows:

"MS. DAVIS [Counsel for Nationwide]: ... What Nationwide has found through their investigation was the question, and still exists today, was he earning income. And that, based on the information Nationwide acquired, is a factual issue.

COURT: Are you saying he was not?

MS. DAVIS: That is Nationwide's contention, yes, Your Honor.

COURT: Well, where is there any fact contained in here that says that he was not?

MS. DAVIS: There is no affidavit with our motion—with our response to Motion, no, Your Honor. There was no—

COURT: Okay. And you failed to file an affidavit?

MS. DAVIS: That's correct, Your Honor.

COURT: All right. Then, under the Rule, I'm going to have to grant the Motion For Summary Judgment."

"I.  Upon granting of summary judgment against the insurer and upon insurer's failure to present any evidence contradicting the insured's claim of loss, the insureds were entitled to a judgment of damages.

II.  The trial court's decision as to the amount of damages was clearly erroneous based on the evidence and the law.

III.  [The Court of Special Appeals] should award damages to the appellants which are consistent with the injuries suffered by them and as provided by the terms of the insurance policy."

We shall address these arguments in a somewhat different order and context, but, as we find no merit in any of them, we shall affirm.

(1) *Mandated Coverage—§ 539(a)*

Although the Martins cite § 539(a) throughout their brief, it seems evident that no claim is really presented under that statute. As noted, it mandates only $2,500 in coverage for PIP benefits, and the Martins have already been paid far more than that. Their sole claim against Nationwide lies under the insurance policy.

(2) *Breach of Contract*

■ The thrust of the Martins' argument, as we understand it, is essentially this: (1) with their motion for summary judgment on Count 1, they presented to the court their proof of claim showing an entitlement by Mr. Martin to wages of $3,000/week;  (2) Nationwide did not controvert that proof of claim or entitlement, and therefore summary judgment in their favor as to liability was properly granted; (3) Judge Lerner's proper role was accordingly limited to assessing damages;  and (4) he exceeded that role and acted improperly in deciding, in effect, that the Martins were not entitled to any damages.

■ Strangely, Nationwide concedes the first three elements of this argument, contesting only whether Judge Lerner erred in limiting the damage award to $1. We do

not accept that concession or, of course, the argument. In our view: Judge Heise was wrong in granting the partial summary judgment in the first instance; that decision was purely interlocutory and was not binding on Judge Lerner; and based on the evidence before him, Judge Lerner should have returned a defendant's verdict. The Martins, in other words, were not entitled even to the dollar.

Judge Heise's ruling obviously adjudicated less than the entire claim. By virtue of Md.Rule 2–602(a), therefore, it

"(1) [was] not a final judgment;

(2) [did] not terminate the action as to any of the claims or any of the parties; and

(3) [was] subject to revision at any time before the entry of a judgment that adjudicates all of the claims by and against all of the parties."

In other words, if Judge Lerner disagreed with the ruling, as he apparently did, he was free to disregard it and enter judgment in accordance with his own view of the law and evidence.

The crux of the matter, of course, is whether Mr. Martin qualifies for "loss of gross income" benefits under the policy simply by reason of his supposed entitlement to wages under his peculiar agreement with Front Desk. In that regard, a careful reading of Judge Lerner's remarks suggests a finding that the whole agreement was a sham and that Mr. Martin never established to his satisfaction that he was actually entitled to $3,000 a week. To the extent that Judge Lerner intended to make, or did make, such a finding, we would not regard it as clearly erroneous based on this record. We do not rest upon any such presumed finding, however. As a matter of basic contract interpretation, we do not believe that Mr. Martin is entitled to further PIP benefits. He was not "earning income from an occupation at the time of the accident" and he did not sustain a "loss of gross income incurred ... after the accident."

We have found no cases precisely on the point before us—whether a person can be regarded as "earning income"

when, though employed, he has no reasonable expectation of actually receiving any valuable remuneration for his services because his employer is impecunious. Decisions dealing with somewhat related situations, however, suggest a lack of coverage in this kind of case.

A number of cases have arisen under the New Jersey no-fault statute requiring PIP coverage for "the loss of income of an income producer as a result of bodily injury disability." N.J.Stat.Ann. § 39:6A–4(b). An "income producer" is defined in the law as a person who, at the time of the accident "was in an occupational status, earning or producing income." N.J.Stat.Ann. § 39:6A–2(d). In *Gambino v. Royal Globe Ins. Co.*, 86 N.J. 100, 429 A.2d 1039 (1981), the most authoritative of the cases, the insured had owned a taxicab company for 16 years but had recently sold the company and was about to start a new job, at a fixed salary, as an insurance broker. Two days before he was to start the new job, he was disabled in an automobile accident. The insurer refused payment for lost income, claiming that the insured had "retired."

The New Jersey Supreme Court, giving an expansive interpretation to the term "income producer" in order to carry out the beneficient purpose of the statute, required the payment. 429 A.2d at 1043, it held that "[r]ecovery is available to those persons who, as part of their normal and prevailing way of life are *gainfully engaged in work that generates income,* but are foreclosed from such normal endeavors or preempted from that usual status because of injuries incurred in an automobile accident." (Emphasis added.)

Under this view, the Court held, the concept of "income producer" would include persons "who have affirmatively made actual arrangements so as to ensure that they will be employed for remuneration at some time in the near future." It would not include, however, "those who perform 'work' as nonpaid volunteers." *Id.*, 429 A.2d at 1044. *See also Hunter v. Hartford Acc. & Indem. Co.*, 155 N.J.Super.

16, 382 A.2d 85 (1977) (insured who had been on voluntary leave of absence because of health problem but about to resume work covered); *Clay v. N.J. Sp. Joint Underwriting Ass'n*, 160 N.J.Super. 188, 389 A.2d 488 (1978) (insured who was collecting unemployment compensation while on temporary layoff covered).

In *State Farm Mut. Auto. Ins. Companies v. Brooks*, 78 A.D.2d 456, 435 N.Y.S.2d 419 (1981), the claimant had been employed at the time of the accident but was laid off two months later. A New York statute required payments for "loss of earnings from work which the injured person would have performed had he not been injured." An implementing regulation of the State Insurance Department provided, however, that benefits would cease if the applicant is discharged from employment "if the position would have been lost had the accident not occurred (e.g. plant shutdowns, strikes, etc.)." The claimant challenged the regulation as being inconsistent with the letter and purpose of the statute, but the court sustained it as "a rational interpretation of the statutory requirement that an injured party be reimbursed for wages he would have earned had he not been injured." *Id.*, 435 N.Y.S.2d at 422.

In *Allison v. Auto–Owners Ins. Co.*, 256 Ga. 446, 349 S.E.2d 682 (1986), the claimant was two weeks shy of completing a year-long job training program that paid her $106/week when she was disabled in an automobile accident. At the time, she had been to a number of interviews but had no job offers or firm promises of work. A Georgia no-fault statute required benefits for a certain percentage of "the loss of income or earnings during disability," and the question arose whether the claimant was entitled, as a matter of law, to any benefits after completion of her paid training program. Citing earlier cases, the Court held that "lost wages and earnings are not recoverable where the evidence does not show the amount of the loss with *reasonable certainty*," and that, where the claimant was not actually employed on the day of the accident, she must at least show that she had " 'accepted an offer of income-generating employment or [has had] a continuous pattern of

employment prior to the period of disability.' " *Id.*, 349 S.E.2d at 683 (quoting from *Leonard v. Preferred Risk Mut. Ins. Co.*, 247 Ga. 574, 277 S.E.2d 675 (1981)). Given the conflicting evidence as to the claimant's prospects, the Court held that the claimant was not entitled to recover as a matter of law. *Compare Auto–Owners Insurance Company v. Sapp*, 185 Ga.App. 661, 365 S.E.2d 286 (1988).

What seems rather clearly to run through these cases is the notion that, to recover under loss of earnings or loss of income coverages, the claimant must show that, but for the covered disability, he would likely have, in fact, received earnings or income. This is a form of disability insurance, not unemployment compensation and not insurance against insolvent employers. Mr. Martin had no continuous pattern of gainful employment prior to the accident and he had no reasonable prospect of actually earning anything like $3,000 a week (much less a gross salary of $6,400 a week) at any time immediately after the accident. Given the circumstances evident in this record, his most favorable employment agreement, if not an outright sham, was at best a celestial pipe dream. Nationwide was entitled to judgment in this case but, as it has not cross-appealed, we shall affirm the one dollar judgment for Mr. Martin.

JUDGMENT AFFIRMED; APPELLANTS TO PAY THE COSTS.