593 A.2d 768

THERMOGRAPHIC DIAGNOSTICS, INC., A NEW JERSEY CORPO-
RATION, PLAINTIFF–RESPONDENT AND CROSS–APPEL-
LANT, v. ALLSTATE INSURANCE COMPANY, DEFENDANT-
APPELLANT AND CROSS–RESPONDENT.

THERMOGRAPHIC DIAGNOSTICS, INC., A NEW JERSEY CORPO-
RATION, PLAINTIFF–RESPONDENT AND CROSS–APPEL-
LANT, v. STATE FARM MUTUAL AUTOMOBILE INSURANCE
COMPANY AND NEW JERSEY AUTOMOBILE FULL INSUR-
ANCE UNDERWRITING ASSOCIATION, DEFENDANTS–AP-
PELLANTS AND CROSS–RESPONDENTS.

Argued February 11, 1991—Decided August 5, 1991.

492

*Andrew T. Berry* and *William T. Barker,* a member of the Illinois bar, argued the cause for appellants and cross-respondents (*McCarter & English* and *Green, Lundgren & Ryan,* attorneys; *Andrew T. Berry, Peter P. Green,* and *Jerry P. Sattin,* on the briefs).

*Michael J. Waldman* argued the cause for respondent and cross-appellant (*Ferrara & Waldman,* attorneys).

The opinion of the Court was delivered by

STEIN, J.

Thermography is a relatively new diagnostic procedure that measures infrared energy emitted by the skin in order to ascertain the presence of significant temperature differences between corresponding areas of opposite sides of the body. Its proponents contend that thermography is useful in the diagnosis of selected neurological and musculoskeletal conditions. The critical issue raised by this appeal is whether thermography is sufficiently established as a valid diagnostic procedure to render it compensable as a reasonable and necessary medical

expense pursuant to the personal injury protection (PIP) coverage provisions of the New Jersey Automobile Reparation Reform Act, *L.*1972, *c.* 70. (No Fault Act or Act). *See N.J.S.A.* 39:6A–2(e), –4(a). A collateral issue concerns the reasonableness of the fees charged for thermographic examinations and readings, an issue of particular significance because of evidence in the record that some physicians who frequently refer patients for thermographic procedures derive a financial gain by participating indirectly in the fees charged for the examination.

After a six-week trial in 1986, in the course of which the parties presented expert testimony favoring and denouncing thermography, the Law Division held that thermographic expenses were compensable under the No Fault Act. 219 *N.J.Super.* 208, 530 *A.*2d 56 (1987). Concluding that the evidence adduced at trial demonstrated that "neuromuscular thermography is sufficiently supported by credible expert testimony to have medical value," *id.* at 221, 530 *A.*2d 56, the Law Division held that the cost of thermography examinations was a necessary expense "if the treating physician orders a thermographic test based upon the physician's sincere belief that the procedure will further the diagnosis and treatment of [the] patient." *Id.* at 227–28, 530 *A.*2d 56. The court noted, however, that the reasonableness of the physician's belief in any given case was reviewable, particularly "where it can be shown that [thermographic] tests not warranted by the circumstances are ordered." *Id.* at 228, 530 *A.*2d 56. The Law Division also held reasonable the fees charged for thermographic examinations, concluding that they were within the range customarily charged for such services within the community. *Id.* at 230, 530 *A.*2d 56. Finally, in a post-trial proceeding subsequent to the filing of its opinion, the Law Division denied plaintiff's application for counsel fees.

The Appellate Division affirmed the trial court's determination that the charges for thermographic examinations can be compensable medical expenses under the No Fault Act. 241 *N.J.Super.* 88, 574 *A.*2d 485 (1990). The Appellate Division

declined to follow the "customary charge" standard in determining the reasonableness of those costs. The court reasoned that the high cost of thermographic examinations in relation to the price of thermographic equipment and the financial interest in thermography fees on the part of some of the referring physicians rendered that standard inappropriate. It remanded the issue of the reasonableness of the charges for redetermination by the trial court. *Id.* at 92, 574 *A.*2d 485.

We granted defendants' petition for certification, 122 *N.J.* 338, 585 *A.*2d 353 (1990), addressing whether and under what circumstances thermographic examinations constitute a necessary medical expense under the No Fault Act, as well as plaintiff's petition for certification, *ibid.*, challenging the Appellate Division's remand to redetermine the reasonableness of the thermographic charges and its affirmance of the Law Division's denial of plaintiff's application for counsel fees.

I

Plaintiff, Thermographic Diagnostics, Inc. (TDI), is engaged in the business of performing thermographic examinations at two New Jersey facilities. TDI instituted separate actions, which were consolidated before trial, against Allstate Insurance Company (Allstate) and State Farm Mutual Insurance Company (State Farm), as assignees of approximately 300 automobile insurance policyholders of Allstate and State Farm. Those insureds had been involved in automobile accidents and had been referred by their respective physicians to TDI for thermographic studies. The insureds submitted TDI's fees for the thermograms to Allstate and State Farm. Both companies refused payment, contending that thermography is an experimental procedure not generally accepted within the medical profession and hence not a necessary medical expense compensable under the Act. Defendants also contended that even if thermography was determined to be a reimbursable procedure under the Act, the amounts charged by plaintiff for thermo-

graphic examinations were excessive and unreasonable and should be adjusted by the court. The trial court permitted the pleadings to be amended during trial to name the New Jersey Automobile Full Insurance Underwriting Association (NJAFI-UA) as a defendant, because NJAFIUA would be obligated to pay some of the claims asserted by TDI.

—A—

We need not recapitulate the extensive trial testimony by plaintiff's experts detailing how thermograms are administered and why they are useful in the diagnosis of certain conditions, nor need we set forth in detail the criticisms of thermography outlined at length by defendants' experts. We offer some general observations, however, about the expert testimony presented at trial. Neither plaintiff's nor defendants' experts presented compelling evidence to resolve the underlying scientific debate about the usefulness of thermography. For the most part, plaintiff's experts were highly-qualified physicians who were actively engaged in providing thermographic examinations, generally deriving substantial income from a financial interest in an entity that owned thermographic equipment and administered examinations. Although the testimony of those experts was clear and comprehensive with respect to the medical value of thermography as a diagnostic tool, their personal interest detracted from the objectivity of their testimony.

In general, defendants' experts fell into two categories. Some were unfamiliar with thermography but provided expert testimony faulting the scientific basis for its effective use. That testimony was generally well presented but quite inconclusive. Substantively, their testimony fell short of discrediting the underlying premise of thermography—that sensory nerve damage will affect blood flow and skin temperature in the affected area. Although highly-qualified physicians, those experts were also unpersuasive because they lacked the research and scientific credentials that would have imparted greater

weight and credibility to their opinions. Three of defendants' experts had engaged in studies designed to test the effectiveness of thermography. Two experts compared thermographic readings of examinations of both normal and diseased patients, concluding that thermography was virtually useless in the diagnosis of sciatica. Another expert collaborated in a study designed to test whether relief of back pain by local anesthesia would produce thermographic changes, concluding that thermography would not detect pain relief. Those studies, however, were subjected to various criticisms and appeared to be unpersuasive on the general question of thermography's value as a collateral diagnostic tool. Defendants also produced Dr. Jan Stolwijk, Chairman of the Department of Epidemiology and Public Health at the Yale University School of Medicine and an expert in skin temperature. Dr. Stolwijk testified that he had used infrared thermography to measure skin temperature, acknowledging that the human body was bilaterally symmetrical with respect to skin temperature and that blood flow was a critical factor affecting skin temperature. He was skeptical about whether the preparation period prior to a thermographic examination was adequate to offset external factors that could affect the accuracy of the examination, but his testimony did not substantially discredit thermography as a useful diagnostic procedure.

The Law Division's opinion includes a concise description of thermography, and a summary of the testimony of one of plaintiff's experts, Dr. Joseph Uricchio, explaining the theoretical physiological basis for its usefulness as a diagnostic procedure:

> Thermography is a relatively new diagnostic tool. Its scientific basis was developed in space and agricultural research. Thermogram means literally a picture of heat. In preparation for a thermographic examination, an individual must follow a strict protocol which eliminates conditions that might affect skin temperature, and just before the pictures are taken the skin is equilibrated with a room temperature of 68 [degrees] to 74 [degrees] Fahrenheit. Thermography is the measure of the infrared radiation from the skin surface of the human body by a scanner. A control unit then converts these emissions into electronic signals, which are displayed by image on a monitor. Color is introduced into

the electronic signal, each color representing an approximate differential of 1 [degree] Centigrade. Pictures taken of this image by a 35-millimeter camera preserve the study for diagnostic purposes. The thermogram of a normal individual is symmetrical, one side of the body being the mirror image of the other. If asymmetry occurs, it is claimed that this differential of heat on the skin's surface shows that there is a nerve impingement or irritation at the root of the dermatome which affects that area of the skin. Also, localized areas of heat change may be reflective of disease states that are attributable to musculoskeletal pathology.

    \*      \*      \*      \*      \*      \*      \*      \*

Joseph [Uricchio], M.D., a practicing orthopedic surgeon in Orange County, Florida, certified by the American Academy of Orthopedic Surgeons[,] testified concerning the medical basis of neuromuscular thermography. He said it is a physiological test that aids primarily in the diagnosis of sensory nerve irritation. He explained that sensory nerves emerge from the spine and travel in recognized patterns called dermatomes, to skin areas. For example, the nerve that emerges at L-4 comes down the buttock and over the front of the thigh and down into the big toe; from L-5 the sensory nerve comes down the side of the buttock and to the middle toes; and from S-1 the nerves come down the back of the thigh into the little toe. These sensory nerves, which allow one to feel sensations, are closely associated with the sympathetic nervous system over which we have no control. He testified that as much as one-third of every sensory nerve is composed of sympathetic nerve fibre. When a sensory nerve gets irritated through trauma or otherwise, the sympathetic nerve fibre associated with that nerve causes vascoconstriction of the capillaries under the skin. Cutting down the size of these blood vessels creates a cooler area on the skin area supplied by that nerve. However, it is only possible to approximate the level at which the irritation occurs since sensory nerves do not correlate exactly to dermatomes. A temperature change often appears on the skin at a dermatomal area one or two levels above or below the irritation. In some cases the temperature change will appear on the side of the body opposite from where the irritated nerve is present. Thermograms are not intended for exact anatomic localization of the irritation. Thermograms do not tell what causes a problem or precisely where it is. Other diagnostic tests are needed to get this information.

However, neuromuscular thermography is the best test for diagnosing the existence of sensory nerve irritation. Its uses are primarily helpful in forming a successful strategy for treatment. Since other tests such as myelograms and Computerized Tomography Scans (CT Scans) give positive results approximately one-third of the time in asymptomatic patients, neuromuscular thermography is indicated as a supplement to a CT Scan to determine whether more aggressive forms of treatment such as a myelogram, hospitalization or surgery are necessary. It is also indicated where patients do not respond to other forms of treatment and it is necessary to determine whether there is an organic basis to pain symptoms.

Dr. [Uricchio] reported on a study of 1,228 patients in which he compared thermographic results from other neurodiagnostic tests. He concluded that abnormal thermograms highly correlated with defects shown by CT Scans and myleograms and also detected abnormalities which were not picked up by those methods. [219 *N.J.Super.* at 210, 212–13, 530 *A.2d* 56.]

After describing the testimony of most of plaintiff's and defendants' expert witnesses, *id.* at 212–20, 530 *A.*2d 56, the Law Division offered this synopsis of the expert testimony:

To summarize the medical testimony, the defendants' experts agree that while there is a theoretical basis to thermography, there is no provable use for it by the practicing physician today. TDI's experts differ in some details as to how thermography shows bodily injury or disease and make clear that neuro-muscular thermography should be applied with discretion. They would use a neuromuscular exam when patients have sensory complaints such as pain, numbness or dyesthesia (tingling sensations) and there is suspected sensory nerve root involvement. However, they believe that thermographic examination should not generally be given for musculoskeletal injuries such as a sprain or strain prior to six or eight weeks after the onset of these symptoms. The human body's natural tendency towards recuperation from this type of injury makes earlier use of thermography in most instances inappropriate. In such cases, neuromuscular thermography becomes appropriate when patients have not responded adequately to conservative forms of treatment such as bed rest, physical therapy or ice massage. Whether used earlier or later in treatment, the proponents of neuromuscular thermography assert two diagnostic purposes. First, it can be used in conjunction with other diagnostic tests to aid in planning treatment strategy. A thermogram in this instance provides an additional means of determining whether there is an organic basis to a patient's complaint. Second, a thermogram can help in determining whether more invasive and dangerous neurodiagnostic tests such as a myelogram or CT Scan [are] warranted. Neuromuscular thermograms correlate[ ] highly with myelograms, an invasive procedure that requires hospitalization and involves a risk of morbidity through injection of dye in the spinal canal as well as with CT Scans, which involve a statistical element of risk through emission of radiation. [*Id.* at 220–21, 530 *A.*2d 56.]

Defendants argued in the Law Division and before us that a medical procedure is not reasonable and necessary, and hence the charge therefor is not reimbursable, under the No Fault Act unless the usefulness of the procedure is generally accepted by a majority of the relevant medical community. Defendants acknowledge that exceptions to the standard of general acceptance would be required for those experimental techniques not yet generally accepted that constitute the only available proce-

dure offering the potential for successful treatment of a patient's condition.

The Law Division rejected defendants' contentions, concluding that a standard of general acceptance by a majority of the medical community

would be inconsistent with the broad scope of the No Fault Act. The Act was intended to allow treating physicians wide discretion in determining the diagnostic test as well as the extent of treatment needed by their patients. This latitude includes minority medical viewpoints within the scope of coverage as well as remedial treatment rendered by religious healers. [*Id.* at 227, 530 *A.*2d 56.]

Relying on its determination that the expert testimony at trial established that "neuromuscular thermography is sufficiently supported by credible expert medical testimony to have medical value," *id.* at 221, 530 *A.*2d 56, the Law Division instead adopted as the standard for reimbursement under the Act the requirement of a "physician's sincere belief that the procedure will further the diagnosis and treatment of his patient," *id.* at 227–28, 530 *A.*2d 56, qualified by the condition that the use of any procedure must be "warranted by the circumstances." *Id.* at 228, 530 *A.*2d 56.

Under the New Jersey No Fault Act, the "necessity" of a medical expense must be decided by the treating physician, the one most qualified to make such a judgment. It should not be the province of the Judiciary to decide, in the face of conflicting expert medical testimony, highly complex questions of medicine and science. Surely the Legislature could not have intended for the Judiciary to sit in the capacity of a medical board of review. Therefore, this court holds that "need" is shown if the treating physician orders a thermographic test based upon the physician's sincere belief that the procedure will further the diagnosis and treatment of his patient. Of course, abuses of this judgment by the physician, where it can be shown that multiple tests are ordered or tests not warranted by the circumstances are ordered, can receive individual scrutiny and review by a court. [*Id.* at 227–28, 530 *A.*2d 56.]

Although defendants criticize the standard for reimbursement adopted by the Law Division as one that delegates to the "subjective sincere belief of the treating physician" the question whether medical expenses are necessary, the record indicates that after trial the parties attempted to evaluate the validity of the claims submitted for reimbursement based on

whether the thermographic examinations were "warranted by the circumstances." Annexed to the judgment for plaintiff entered by the Law Division is a Schedule B entitled "Claims Both Parties Agree Are Not to Be Paid By Allstate," consisting of somewhat more than fifty claims that, according to the Law Division's judgment, "are not eligible for payment based upon agreement between the plaintiff and Allstate * * * and State Farm * * * that they were not within the class of payable claims described in this Court's opinion." Although the Schedule noted that some of the claims had been rejected because of coverage problems—either the policy had expired or the expense was within the policy's deductible limits—most of the claims listed on the schedule were rejected because the thermographic test had been performed too soon after the date of the accident. As the trial court had observed, summarizing the testimony of plaintiff's experts:

[T]hey believe that thermographic examination should not generally be given for musculoskeletal injuries such as a sprain or strain prior to six or eight weeks after the onset of these symptoms. The human body's natural tendency towards recuperation from this type of injury makes earlier use of thermography in most instances inappropriate. [*Id.* at 220, 530 *A.*2d 56.]

In rejecting by stipulation the claims of patients who had been referred for thermography too quickly following the occurrence of the injury, plaintiff and defendant Allstate acknowledged that the trial court's standard for reimbursement took into account not only the physician's sincere subjective belief that thermography would aid diagnosis but also whether the thermographic examination was objectively warranted by the circumstances. Because defendants' petition for certification did not seek review of whether claims not excluded from reimbursement by Schedule B were nevertheless appropriate for reimbursement under the Law Division's standard, we have no occasion to consider in this opinion whether those claims included for reimbursement in the judgment of the Law Division were "warranted by the circumstances," based on criteria for the proper use of thermography set forth in the testimony of plaintiff's experts.

The inconclusive quality of the testimony at trial, combined with the post-trial efforts of both parties to supplement the record with new studies on the value or ineffectiveness of thermography, reinforce our view that the usefulness of thermography as a diagnostic procedure is a subject on which evolving scientific studies and research will continue to be enlightening, conceivably affording a basis either for future litigation or administrative regulation. Our disposition of this appeal, however, is based only on the record before the Law Division as supplemented by leave granted by the Appellate Division. In that connection, we take specific note of the Informational Report of the Council on Scientific Affairs of the American Medical Association, December 1987, entitled "Thermography in Neurological and Musculoskeletal Conditions" (Thermography Report).

As supplemented, the record reflects that the Council on Scientific Affairs (Council) is one of eight councils established by the Bylaws of the American Medical Association (AMA), and serves as an advisory body to the AMA on scientific issues. Its scientific reports cannot be revised either by the AMA's Board of Trustees or House of Delegates without the Council's consent. The current status of the Council's Thermography Report is sharply contested by the parties, defendants asserting that the report was repudiated by the AMA's House of Delegates when that body adopted a resolution requesting that the Council reconsider its Thermography Report. Plaintiff contends that the Council's report remains valid and effective, citing correspondence from the AMA's General Counsel's office stating that although the Council has continued to monitor relevant scientific literature, no data have been published that warrant revision of the Council's Thermography Report. We acknowledge the ongoing controversy over the present status of the Council's Thermography Report, as well as the authoritative standing of the Council and the objectivity that apparently characterizes its selection of panel members to participate in the preparation of scientific reports. The Council's *Abstract* of

its Thermography Report adequately reflects the Report's conclusions:

> Thermography is a safe adjunctive physiological procedure which may be useful in the diagnosis of selected neurological and musculoskeletal conditions. Thermography is noninvasive and does not involve the use of ionizing radiation. Thermography may facilitate the determination of spinal nerve root and distal peripheral nerve dysfunction. Thermography also contributes to the evaluation of possible autonomic nervous system dysfunction and of spinal disorders.
>
> Thermography may be useful in documenting peripheral nerve and soft tissue injuries, such as muscle and ligament sprain, inflammation, muscle spasm, and myositis. Thermography is helpful in the diagnosis of reflex sympathetic dystrophy and can be used to follow the course of patients after spinal surgery.
>
> In those applications, thermography does not stand alone as a primary diagnostic tool. It is a test of physiological function that may aid in the interpretation of the significance of information obtained by other tests. In recent years, an increasing number of correlative studies have been published. Few of these studies can be characterized as well-controlled. This fact limits attempts at a definitive analysis of the overall value of thermography. More research will help to clarify the exact contribution of thermography to diagnostic problems.

—B—

Dr. Philip Getson, an osteopath who is the medical director and principal stockholder of TDI, testified that TDI customarily charges patients $325 for á thermogram of the lumbar area, $325 for a cervical thermogram, and $100 for a thoracic thermogram. Dr. Getson testified that these fees were consistent with. charges for thermographic examinations in New Jersey and throughout the country, although one of TDI's witnesses, Dr. Jacob Green, testified that he customarily charges $450 for a complete thermographic study.

Dr. Getson and his brother Lee, also a stockholder of TDI, have established two limited partnerships: Thermographic Analysis, whose limited partners are osteopaths, and Diagnostic Thermographic Analysis, whose limited partners are chiropractors. Lee Getson is the general partner of both limited partnerships. The limited partnerships have no offices and do not own thermographic equipment. Nevertheless, the osteopaths and chiropractors who are limited partners refer their respective

patients to Thermographic Analysis and Diagnostic Thermographic Analysis for thermographic examinations, but the examinations are actually performed by TDI at its offices and with its equipment. TDI charges the limited partnerships $97.50 for a single-area study and approximately $200 for a full thermographic series. TDI then renders bills to the patients in its own name, but on behalf of the limited partnerships, based on its higher customary rates for thermographic examinations. The limited partnerships, which refer the patients to TDI and supply the film for the thermograms, realize profits that reflect the difference between TDI's customary charges and its reduced rates to the partnerships. At trial, an attorney who advised the Getsons in connection with the establishment of the limited partnerships testified that the profit distributions to the limited partners from the two partnerships were permitted by law, because those distributions were based not on the number of patient referrals but rather on the limited partners' percentage interests in the partnerships.

Defendants contend that TDI's charges are excessive in view of the relatively modest capital investment in thermographic equipment—about $40,000—compared with TDI's gross monthly revenues that exceed $90,000 and approximate monthly expenses of $7,400. Defendants also assert that TDI's fees are unreasonable in relation to the customary charges for other diagnostic imaging techniques requiring substantially more expensive equipment. The Law Division observed that the capital investment required for a Computerized Axial Tomography (CAT) Scanner was approximately $1,000,000, and the customary fee for a CAT Scan was about $450. Similarly, the court noted that the cost of a Magnetic Resonance Imaging (MRI) machine was approximately $1,000,000 and that the MRI examination fee was approximately $700 to $800. 219 *N.J.Super.* at 228–29, 530 *A.*2d 56.

The Law Division acknowledged that there was "merit in the charge that TDI's fees appear to be different for certain classes of patients and perhaps too high from a cost standpoint," *id.* at

230, 530 *A.*2d 56, but declined "to review in detail the accounting basis for these fees." *Ibid.* Referring to the report of a Senate committee recommending legislation to authorize the Commissioner of Insurance to promulgate reimbursement schedules for health-care providers, *Senate Special Committee Report on Automobile Insurance Reform,* Final Report 17–18 (Sept.1986) (Final Report), the court observed that the responsibility for determining the reasonableness of medical fees should be assumed by the agency administering the Act. Concluding that TDI's fees were "within a range customarily charged for such service within the community," *see* M. Iavicoli, *No Fault & Comparative Negligence in New Jersey* 42 (1973), the Law Division sustained the reasonableness of TDI's charges. 219 *N.J.Super.* at 230, 530 *A.*2d 56.

Although affirming the Law Division's holding that thermography is compensable as a necessary medical expense under the No Fault Act, the Appellate Division disagreed with its conclusion that the "community range" standard was determinative of the reasonableness of TDI's fees for thermographic examinations. 241 *N.J.Super.* at 90, 574 *A.*2d 485. The Appellate Division noted its concern about the disparity between the amount of TDI's charges to the general public and the fees charged to the limited partnerships that referred patients to TDI for thermographic examinations. *Id.* at 92, 574 *A.*2d 485. The court also questioned the propriety of the relationship between the referring physicians and TDI, pursuant to which the limited partners participated in profits derived from thermographic fees charged to patients they had referred to TDI. *Id.* at 91, 574 *A.*2d 485. The Appellate Division concluded that exclusive reliance on a "community range" test of reasonableness was inappropriate in these circumstances and remanded the matter to the Law Division to redetermine the issue of the reasonableness of the fees charged by TDI. *Id.* at 92, 574 *A.*2d 485.

## II

### —A—

We first address whether TDI's charges for thermographic examinations constitute "medical expenses" under the No Fault Act. The Act mandates that automobile liability insurance policies provide personal injury protection coverage, defined to include payment of reasonable medical expenses. *N.J.S.A.* 39:6A–4. The Act broadly defines medical expenses:

"Medical expenses" means expenses for medical treatment, surgical treatment, dental treatment, professional nursing services, hospital expenses, rehabilitation services, X-ray and other diagnostic services, prosthetic devices, ambulance services, medication and other reasonable and necessary expenses resulting from the treatment prescribed by persons licensed to practice medicine and surgery pursuant to R.S. 45:9–1 et seq., dentistry pursuant to R.S. 45:6–1 et seq., psychology pursuant to P.L.1966, c. 282 (C. 45:14B–1 et seq.) or chiropractic pursuant to P.L.1953, c. 233 (C. 45:9–41.1 et seq.) or by persons similarly licensed in other states and nations or any nonmedical remedial treatment rendered in accordance with a recognized religious method of healing. [*N.J.S.A.* 39:6A–2(e).]

We note that the statutory definition lists specific enumerated services within the term "medical expenses," included among which are "diagnostic services," the statutory category that broadly encompasses thermographic examinations. The enumerated services are followed by a general category consisting of "other reasonable and necessary expenses resulting from the treatment prescribed by persons licensed to practice medicine." *Ibid.* One commentator has observed that "the general language [implies] that the specifically enumerated medical expenses must also be reasonable and necessary." M. Iavicoli, *supra*, at 42. The Law Division agreed with that interpretation of the definition of "medical expenses," 219 *N.J.Super.* at 210, 530 *A.2d* 56, as do we.

We note specifically that the statutory definition of medical expenses includes "nonmedical remedial treatment rendered in accordance with a recognized religious method of healing," *N.J.S.A.* 39:6A–2(e), a provision obviously intimating a legislative purpose to allow a measure of flexibility in the application

of the statute. The statute is otherwise uninformative concerning the scope of the term "reasonable and necessary medical expenses," remitting this Court to the task of construing the statutory language in a manner consistent with the objectives and intent of the Legislature. *See Safeway Trails, Inc. v. Furman,* 41 *N.J.* 467, 477, 197 *A.*2d 366, *cert. denied,* 379 *U.S.* 14, 85 *S.Ct.* 144, 13 *L.Ed.*2d 84 (1964).

The No Fault Act "encompasse[d] the recommendations of the Automobile Insurance Study [C]ommission." *Sponsor's Statement to L.1972, c. 70.* That Commission identified four principal objectives to be addressed by its legislative recommendations:

(1) The prompt and efficient provision of benefits for all accident injury victims. (The *Reparation* objective.)

(2) The reduction or stabilization of the prices charged for automobile insurance. (The *Cost* objective.)

(3) The ready availability of insurance coverage necessary to the provision of accident benefits. (The *Availability* objective.)

(4) The streamlining of the judicial procedures involved in third-party claims. (The *Judicial* objective.) [Automobile Insurance Study Commission, *Reparation Reform for New Jersey Motorists* 7 (1971) (Commission Report).]

Recognizing that attainment of one objective might require a sacrifice in the attainment of one or more of the others, the Commission concluded that the ultimate purpose of the Act is "simultaneous attainment of all four objectives while * * * maintaining a reasonable balance among them." *Id.* at 7. The Commission noted specifically that the cost and reparation objectives "are in most instances antagonistic." *Id.* at 65.

The Commission characterized the reparation objective as the " 'primary purpose of [the] automobile insurance system' " and gave that objective " 'priority' " in creating the proposals that formed the basis of the Act. *Gambino v. Royal Globe Ins. Co.,* 86 *N.J.* 100, 106, 429 *A.*2d 1039 (quoting Commission Report, *supra,* at 41). "The failure of many automobile accident victims to receive any, or adequate, reimbursement for their injuries was considered a major deficiency in the tort liability system that existed prior to the institution of the no-

fault law and an unwarranted hardship upon unfortunate victims." *Ibid.*

Defendants note that the reduction and stabilization of the costs of insurance is also an important purpose of the Act. *See* Commission Report, *supra,* at 30. In addition to characterizing the reparation objective as the "primary" objective of the Act, however, the Commission expressed its unwillingness to sacrifice reparation and availability to concerns of cost. *Id.* at 30, 120. Moreover, recognizing that the increase in claims engendered by the no-fault system might heighten the potential for fraud, the Commission concluded that in the interest of balancing the cost and reparation objectives, the optimal way to discourage fraud is the imposition of "stringent penalties." *Id.* at 131.

In *Gambino,* we also noted that "[t]he problem of long delays in obtaining compensation was perceived as the primary flaw in the previous system." 86 *N.J.* at 107, 429 *A.*2d 1039. The No Fault Act implemented the Commission's judicial objective through provisions designed "[t]o minimize the workload placed upon the courts by enabling losses to pass into claims * * * with a minimum of judicial intermediation." Commission Report, *supra,* at 24. We concluded that the No Fault Act should be construed, "whenever possible, to promote *prompt* payment to *all* injured persons for *all* of their losses. Consequently, approaches which minimize resort to the judicial process, or at least do not increase reliance upon the judiciary, are strongly to be favored." *Gambino, supra,* 86 *N.J.* at 107, 429 *A.*2d 1039.

▮ In construing the term "reasonable and necessary medical expenses" in the context of the objectives that inspired passage of the No Fault Act, we seek an interpretation reconcilable with the legislative goals although mindful that in some respects those objectives may be antagonistic. Hence, we note that the standard advocated by defendants—that a necessary medical expense is one generally accepted by a majority of the

medical community—although advancing the Act's cost objectives, might simultaneously frustrate its reparation objectives. We also find that test inappropriate on other grounds. The general acceptance of a scientific principle is a standard most frequently encountered in determining the admissibility of scientific or medical evidence. See *Frye v. United States,* 293 *F.* 1013, 1014 (D.C.Cir.1923). We recently summarized the principles that guide our courts in admitting scientific evidence:

"In New Jersey, the results of scientific tests are admissible at a criminal trial only when they are shown to have "sufficient scientific basis to produce uniform and reasonably reliable results and will contribute materially to the ascertainment of the truth." *State v. Hurd,* 86 *N.J.* 525, 536 [432 *A.*2d 86] (1981) (quoting *State v. Cary,* 49 *N.J.* 343, 352 [230 *A.*2d 384] (1967)). Scientific acceptability need not be predicated upon a unanimous belief or universal agreement in the total or absolute infallibility of the techniques, methodology or procedures that underlie the scientific evidence. * * * Reliability of such evidence must be demonstrated by showing that the scientific technique has gained general acceptance within the scientific community. *State v. Johnson,* 42 *N.J.* 146, 170–71 [199 *A.*2d 809] (1964). The fact that a possibility of error exists does not preclude a conclusion that a scientific device is reliable. This Court in *Johnson* noted: "Practically every new scientific discovery has its detractors and unbelievers, but neither unanimity of opinion nor universal infallibility is required for judicial acceptance of generally recognized matters." *Id.* at 171 [199 *A.*2d 809]. Once the showing of general acceptability has been made, courts will take judicial notice of the given instrument's reliability and will admit in evidence the results of tests from the instrument without requiring further proof." [*Windmere, Inc. v. International Ins. Co.,* 105 *N.J.* 373, 378, 522 *A.*2d 405 (1987) (quoting *Romano v. Kimmelman,* 96 *N.J.* 66, 80, 474 *A.*2d 1 (1984).]

Use of a standard of general acceptance to serve as a threshold for admissibility of scientific evidence has been justified on the basis that "the matter of inquiry is such that inexperienced persons are unlikely to prove capable of forming a correct judgment upon it." *Frye, supra,* 293 *F.* at 1014. We do not find comparable justification for using that standard to determine the reimbursability of medical expenses under the No Fault Act. In the context of the Act's legislative history and its authorization of reimbursement for treatment consistent with a "recognized religious method of healing," *N.J.S.A.* 39:6A–2(e), we consider the standard of general acceptance by a majority of

the medical community to be overly restrictive and generally incompatible with the primary objectives of the Act.

We derive little insight from the case law in other jurisdictions. In *Victim v. Martin*, 367 *Mass.* 404, 326 *N.E.*2d 12 (1975), the Supreme Judicial Court of Massachusetts, construing an analogous provision of that state's no-fault insurance law, required that "the treatment rendered by a competent medical doctor was a bona fide effort to alleviate and ameliorate the injury," *id.* at 407, 326 *N.E.*2d at 15, and that the medical services rendered were " 'wise in the light of the facts known at the time they were rendered.' " *Id.* at 409, 326 *N.E.*2d at 16 (quoting *Hunt v. Boston Terminal Co.*, 212 *Mass.* 99, 101, 98 *N.E.* 786, 786 (1912)). Other jurisdictions have construed the term "necessary medical expenses" in determining reimbursability under policies of insurance. *See, e.g., Sarchett v. Blue Shield*, 43 *Cal.*3d 1, 13, 729 *P.*2d 267, 275, 233 *Cal.Rptr.* 76, 84 (1987) (physician's determination of necessity relevant but must be reasonable, with uncertainties about reasonableness resolved in favor of coverage); *Group Hospitalization v. Levin*, 305 *A.*2d 248, 250 (D.C.1973) (necessary means reasonably calculated to shorten and relieve pain and effectuate most rapid recovery); *Shumake v. Travelers Ins. Co.*, 147 *Mich.App.* 600, 609–611, 383 *N.W.*2d 259, 264 (1985) (physician's determination of necessity entitled to great weight but reviewable by court "in light of knowledge which existed at the time the decision was rendered"); *Lockshin v. Blue Cross*, 70 *Ohio App.*2d 70, 72–74, 434 *N.E.*2d 754, 756–57 (1980) (decision of physician is relevant and probative on issue of necessity, but not dispositive if, on judicial review, record does not confirm that determination).

In our view, a modification of the standard applied by the Law Division that emphasizes the objective reasonableness of the medical procedure recommended by a physician would best serve the various objectives of the Act. Thus, we hold that except for nonmedical remedial treatments consistent with

a recognized religious method of healing, *N.J.S.A.* 39:6A–2(e), a necessary medical expense under the Act is one incurred for a treatment, procedure, or service ordered by a qualified physician based on the physician's objectively reasonable belief that it will further the patient's diagnosis and treatment. The use of the treatment, procedure, or service must be warranted by the circumstances and its medical value must be verified by credible and reliable evidence. That standard, in our view, is consistent with the reparation objectives of the Act in that it would allow reimbursement for innovative medical procedures warranted by the circumstances that have demonstrable medical value but have not yet attained general acceptance by a majority of the relevant medical community. It will also accommodate reimbursement for promising experimental medical techniques constituting the only realistic means for treatment of certain patients, which defendants acknowledge would not qualify under a general-acceptance standard. In requiring that the physician's belief that the procedure will advance diagnosis or treatment be objectively reasonable, that its medical value be verified, and that the procedure be warranted by the circumstances, the standard we adopt also complements the cost-containment objectives of the No Fault Act. As noted, *supra* at 501, 593 *A.*2d at 774, a number of claims for reimbursement of thermographic charges were excluded by stipulation from the judgment entered by the trial court, primarily on the ground that the examinations were ordered too soon after the accident to satisfy one of the basic criteria for effective use of thermography cited by the Law Division—a waiting period of six to eight weeks after the onset of symptoms. 219 *N.J.Super.* at 220, 530 *A.*2d 56.

The foregoing standard is also generally consistent with prior decisions construing the No Fault Act. *See, e.g., Stewart v. Allstate Ins. Co.*, 103 *N.J.* 139, 143, 510 *A.*2d 1131 (1986) (cost of specially-modified van that can be operated independently by plaintiff, a paraplegic and internationally-known wheelchair athlete, compensable as necessary medical expense based on undis-

puted medical testimony of reasonable relationship to significant therapeutic benefit for mental or physical disability); *Paul v. Ohio Casualty Ins. Co.*, 196 *N.J.Super.* 286, 295–98, 482 *A.*2d 199 (App.Div.1984) (cost of twenty-four-hour attendant care and services of health care coordinator for quadriplegic with "Locked–In Syndrome" compensable as necessary medical expense based on testimony that services were necessary to prevent patient's further deterioration and hospitalization); *Miskofsky v. Ohio Casualty Ins. Co.*, 203 *N.J.Super.* 400, 414, 497 *A.*2d 223 (Law Div.1984) (cost of therapy, heat treatments, medication, and exercises not designed to cure patient but reasonably conducive to relieving painful symptoms constitutes necessary medical expense under No Fault Act).

■ On the basis of our comprehensive review of the record, we are satisfied that the trial court's finding that thermography has medical value as a diagnostic procedure was supported by substantial reliable and credible evidence. Several of plaintiff's experts carefully explained the scientific basis of thermography and verified its effectiveness under specific criteria for assisting in the diagnosis of certain neurological and musculoskeletal conditions. Although the objectivity of plaintiff's experts was undermined by their financial interest in the practice of thermography, their testimony with respect to the use and effectiveness of thermography constituted an adequate basis for the trial court's findings. The trial court obviously concluded that the testimony of defendants' experts was insufficient to rebut or repudiate the conclusions expressed by plaintiff's witnesses. Although not part of the record before the trial court, the Thermography Report of the AMA's Council on Scientific Affairs, see *supra* at 503–504, 593 *A.*2d at 775–776, adds significant reinforcement to the trial court's conclusion that thermography has medical value as a diagnostic procedure.

■ We note our concern about evidence in the record indicating that some physicians use thermography indiscriminately, apparently disregarding the accepted standards and criteria

that condition its effectiveness. Our holding should not be understood to limit the right of insurance carriers to challenge thermographic charges on the ground that they were unwarranted by the circumstances or because the physician's determination that thermography would further diagnosis was not objectively reasonable. Such issues are not presented by this record, the parties having undertaken to resolve by stipulation whether certain charges for thermographic examinations for which plaintiff sought recovery were not warranted by the circumstances.

—B—

In considering the issue of the reasonableness of TDI's fees for thermographic examinations, the Law Division acknowledged its reluctance "to review in detail the accounting basis for these fees," 219 *N.J.Super.* at 230, 530 *A.*2d 56, expressing the view that that function should be performed by the agency charged with administering the No Fault Act. The Law Division relied specifically on the recommendations of the Senate Special Committee on Automobile Insurance Reform:

> The committee believes that it is essential that some steps be taken to ensure that there is cost containment with respect to the paying of medical expense benefits under personal injury protection coverage. Reimbursement schedules for health care providers are common in connection with health insurance policies, and the committee believes that the same princip[le] should be applied with respect to reimbursement of providers under automobile insurance policies. Accordingly, the committee recommends that legislation be enacted which requires the Commissioner of Insurance to promulgate reimbursement schedules for health care providers on a regional basis. The fee schedule should incorporate the reasonable and prevailing fees of 90% of the practitioners within the defined region. If the number of specialists within a region is less than 50, a statewide standard should apply. The fee schedule would be revised on a biannual basis. [*Ibid.* (quoting Final Report, *supra,* at 17–18).]

Implementing the Committee's recommendation, the Legislature amended the Act to require the Commissioner of Insurance to adopt medical-fee schedules that impose limits on the amounts payable by automobile insurers for medical expenses

reimbursable under PIP coverage. *L.*1988, *c.* 119. *N.J.S.A.* 39:6A-4.6 provides:

> The Commissioner of Insurance shall, within 90 days after the effective date of P.L.1990, *c.* 8 (C. 17:33B-1 et seq.), promulgate medical fee schedules on a regional basis for the reimbursement of health care providers providing services or equipment for medical expense benefits for which payment is to be made by an automobile insurer under personal injury protection coverage pursuant to P.L.1972, c. 70 (C. 39:6A-1 et seq.). These fee schedules shall be promulgated on the basis of the type of service provided, and shall incorporate the reasonable and prevailing fees of 75% of the practitioners within the region. If, in the case of a specialist provider, there are fewer than 50 specialists within a region, the fee schedule shall incorporate the reasonable and prevailing fees of the specialist providers on a Statewide basis. These schedules shall be reviewed biannually by the commissioner.
>
> No health care provider may demand or request any payment from any person in excess of those permitted by the medical fee schedules established pursuant to this section, nor shall any person be liable to any health care provider for any amount of money which results from the charging of fees in excess of those permitted by the medical fee schedules established pursuant to this section.

In April 1989, the Commissioner of Insurance promulgated proposed fee schedules. 21 *N.J.R.* 842(b)–845 (1989) (codified at *N.J.A.C.* 11:3–29). Thermography was not included on the extensive list of medical services covered by the fee schedule. In proposing the fee schedule, the Department of Insurance "realize[d] that many other medical services not specifically listed are nevertheless provided to victims injured in automobile accidents. * * * Development of fees for these services will continue, and these rules will be amended to include them as they are developed." *Id.* at 843.

The regulations currently in effect contain this reference to medical services or equipment not included in the fee schedules:

> The insurer's limit of liability for any medical expense benefit for any service or equipment not set forth in the fee schedules shall be a reasonable amount considering the fee schedule for similar services or equipment in the region where the service or equipment was provided * * *. Where the fee schedule does not contain a reference to similar services or equipment as set forth in the preceding sentence, the insurer's limit of liability for any medical expense benefit for any service or equipment not set forth in the fee schedules shall not exceed the usual, customary and reasonable fee. [*N.J.A.C.* 11:3–29.4(e).]

■ The legislative direction to the Commissioner was that fee schedules incorporate the reasonable and prevailing fees of 75% of practitioners within a region, or where there are insufficient practitioners the reasonable and prevailing fees of physicians on a statewide basis. *N.J.S.A.* 39:6A–4.6. The regulations provide that with respect to services not listed on the fee schedule the insurer's limit of liability "shall be a reasonable amount considering the fee schedule for similar services in the region where the service was provided." *N.J.A.C.* 11:3–29.4(e). Although neither the statute nor the implementing regulations were in effect at the time of trial, the schedule of fees for similar services promulgated by the agency charged with administering the No Fault Act is pertinent to a determination of the reasonableness of TDI's fees for thermographic examinations. *Cf. Malone v. Fender*, 80 *N.J.* 129, 137, 402 *A.2d* 240 (1979) (in construing statute, court may consider interpretation given statute by administrative agency charged with statute's effectuation).

■ We are fully in accord with the Appellate Division's conclusion that the customary and prevailing fees for thermographic examinations at the time of trial should not be conclusive in determining whether those fees are reasonable. *See* 241 *N.J.Super.* at 92, 574 *A.2d* 485. As noted, *supra* at 504–506, 593 *A.2d* at 776–777, TDI's fees are facially suspect for several reasons. Significantly, its charges to the limited partnerships of chiropractors and osteopaths that refer patients to TDI are lower than its charges to the general public. The differences are astonishing. TDI charges the limited partnerships $97.50 for a single-area study, whereas the public is charged $325 for either a cervical or lumbar thermogram. The charge to the limited partnerships for a full thermographic series is $200, and the charge to the public is $750. Indulging in the assumption that TDI is not providing services to the partnerships at a loss, the inference is unmistakable that its charges to the public return a generous, if not excessive, profit.

The financial relationship between the limited partnerships and TDI also causes concern on other grounds. As the record demonstrates with unmistakable clarity, the limited partnerships profit from the difference between their reduced rates for TDI's thermographic examinations of their patients and the substantially-higher rates charged to their patients on their behalf by TDI. The profit realized then is distributed to the chiropractors and osteopaths who invested in the limited partnerships and also referred to TDI the patients whose fees generated those profits.

That type of self-referral entrepreneurship has become increasingly prevalent within the medical profession. *See When Healers are Entrepreneurs: A Debate Over Costs and Ethics, N.Y. Times,* June 2, 1991, at 1, col. 1. Such arrangements also have been the subject of severe criticism within the health-care community. "It should be regarded as unethical and unacceptable for physicians to have ownership interests in health care facilities to which they make referrals or to receive payments for making referrals." Committee on Implications of For–Profit Enterprise in Health Care, Institute of Medicine, *For–Profit Enterprise in Health Care* 163 (1986). *See also* Hyman & Williamson, *Fraud and Abuse: Setting the Limits on Physicians' Entrepreneurship,* 320 *New Eng.J.Med.* 1275, 1278 (1989) ("Entrepreneurship among physicians may be quite lucrative, but the response from Congress, the Department of Health and Human Services, and public opinion polls suggests that its inherent conflicts of interest have not gone unnoticed. The final word is not yet in, but a dramatic curtailing of entrepreneurial activity seems imminent."); Relman, *Dealing with Conflicts of Interest,* 313 *New Eng.J.Med.* 749, 750 (1985) ("Such arrangements introduce a new and unnecessary conflict, which strains the physician's fiduciary commitment to the patient."). Effective July 29, 1991, the Department of Health and Human Services has adopted regulations that limit physician referrals of Medicare and Medicaid patients to clinics and health-care businesses in which the physicians are investors.

See 56 *Fed.Reg.* 35,952 (1991) (to be codified at 42 *C.F.R.* § 1001). The potential for abuse inherent in the self-referral aspect of the relationship between the limited partnership and TDI is an added reason why the "community standard" is not necessarily a reliable measure of the reasonableness of TDI's fees. With respect to a service like thermography involving but a limited number of practitioners, the self-referral feature of the arrangement between the limited partnerships and TDI underscores the need for close scrutiny of prevailing fees in order to verify that they are both customary and reasonable.

Moreover, we are struck by the enormous disparity between the cost of thermographic examinations in relation to the relatively-modest cost of thermographic equipment, as compared with the comparable cost of CAT Scans and MRI examinations in relation to the substantially higher cost of that equipment. See *supra* at 505, 593 *A*.2d at 783. To the extent that prevailing fees for various diagnostic-imaging techniques reflect in part the amortization costs of the equipment and in part the value of the physicians' services, physicians performing thermographic examinations are obviously compensated at a disproportionately-higher level than those performing CAT Scans and MRI examinations. We also note that the fee schedules promulgated by the Commissioner of Insurance establish maximum fees for a variety of diagnostic-imaging techniques, including x-rays, CAT Scans, and MRI examinations. See *N.J.A.C.* 11:3–29.6. Those fees may provide a useful frame of reference in determining the reasonableness of TDI's fees for thermographic examinations.

On this record, we are in accord with the Appellate Division's conclusion that the reasonableness of TDI's fees should not be determined solely on the basis that they are consistent with the prevailing rates for thermographic examinations. Accordingly, we remand the matter to the Law Division to determine the reasonableness of the charges TDI seeks to recover from defendants.

We also find no basis on which to disturb the trial court's discretionary determination denying plaintiff's application for counsel fees.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*For reversal*—None.