*437 OPINION OF THE COURT
William A. Viscovich, J.
In this matter, which appears to be a case of first impression, plaintiff provider brought the within action to recover payment under no-fault for medical services, namely, electromyogram testing and nerve conduction velocity testing (hereafter EMG and NCV testing, respectively) performed for Vanessa Garcia, its assignor. At trial, the parties stipulated to the sufficiency of plaintiffs prima facie case and agreed that the only issue for this court to determine is whether defendant could demonstrate that the tests were not medically necessary.
Defendant’s unique and novel argument, as presented to this court over the course of several days of testimony, is that while the tests as prescribed were, in fact, medically necessary, they were done in a manner so incomplete that the results were useless in terms of the diagnosis and treatment of the patient. As such, defendant argues that they are rendered medically unnecessary as a practical matter and therefore not eligible for reimbursement under the state’s no-fault statutes. Plaintiff counters with three points: first, that the tests were medically necessary; second, that the test results were in fact useful; and third, that the only issue for this court to decide is the medical necessity of the tests as prescribed, the issue of whether or not they were done correctly being irrelevant.
In the instant case, State Farm’s medical expert, Dr. James B. Sarno, determined that a complete bilateral EMG/NCV of the upper and lower extremities was, in fact, medically necessary for the treatment and care of the assignor, Vanessa Garcia, for injuries she sustained in the subject motor vehicle accident. However, Dr. Sarno further determined that the EMG/NCV study as actually administered was so incompletely performed as to be contrary to the accepted standard of care for administering said test when utilizing it to assess “electro-diagnostic evidence of radiculopathy,” thus rendering it medically unnecessary. According to Dr. Sarno, this was particularly so in light of Ms. Garcia’s injuries, the suspicion of radiculopathy in both the upper and lower extremities, her complaints of pain and her nonresponsiveness to a rehabilitation program. The doctor’s position is that the tests, as administered, would have no utilization in determining and evaluating her past and future treatment.
According to Dr. Sarno, the tests were rendered useless due to the plaintiffs failure to test the muscles in the forearm (other *438 than the brachioradialis) and in the hand. As such, plaintiff failed to properly study the C7, C8 and T1 nerve roots, a deviation from the accepted standard of care for administering said test when “assessing evidence of electro-diagnostic radiculopathy.” In fact, Dr. Sarno testified that the impression purportedly obtained from said tests, a bilateral C4 radiculopathy, could not have been obtained to any degree of medical certainty from the incomplete nature of the muscles tested and that it was a deviation from accepted medical protocol to have concluded same from the minimal number of muscles tested.
As for the lower extremity EMG, Dr. Sarno maintained that by failing to test the muscles in the extensor hallus longus, the peronei, the glutei, all muscles in the quadriceps and the paraspinal muscles, the plaintiff deviated from the accepted standard of care for administering said test when assessing evidence of electrodiagnostic radiculopathy. As such, it is defendant’s contention that the subject EMG/NCV studies were found normal in the lower extremities due only to plaintiffs failure to test the requisite muscles. Had they been done correctly, Dr. Sarno maintains, Ms. Garcia’s diagnosis and treatment plan may have been properly furthered and she could have actually benefitted from her rehabilitation.
Testifying for the plaintiff, Dr. Finkelstein, in sum and substance, agreed with Dr. Sarno that the tests were medically necessary. The disagreement between the two testifying experts, however, lies in Dr. Finkelstein’s belief that the tests as performed were not incomplete and that they were useful for the diagnosis and treatment of the patient. His position was that while the testing may not have been “thorough” it was “not incomplete.” More specifically, Dr. Finkelstein maintained that the tests as done had the benefit of confirming radiculopathies at both the C3-4 and C5-6 levels of the spine and could have an impact on the patient’s treatment.
Both Dr. Sarno and Dr. Finkelstein acknowledge that EMG/ NCVs are extremely uncomfortable and painful for the patient. It should be noted that Dr. Sarno maintains that a proper testing regimen in this case required the placing of needles in 48 muscles, while Dr. Finkelstein’s position was that, for this case, the placing of needles in 22 muscles was sufficient, particularly if the patient was having a difficult time dealing with the procedure.
*439 Conclusions of Law
New York’s no-fault law mandates that services must be reasonable and necessary in order to be reimbursable, but neither statute nor case law specifically addresses the issue of what constitutes “medical necessity” in the context of no-fault litigation. Given that the legislature, the Appellate Terms and the Appellate Divisions of this state have, it seems, yet to establish a specific definition or set of guidelines upon which this court could rely, they must be derived from lower court decisions. In this context, the two most regularly cited cases appear to be two matters decided in Queens County Civil Court. The first, Medical Expertise v Trumbull Ins. Co. (196 Misc 2d 389 [2003]), was written by Judge Bernice Siegal, and the second, Fifth Ave. Pain Control Ctr. v Allstate Ins. Co. (196 Misc 2d 801 [Civ Ct, Queens County 2003]), was written by Judge Augustus C. Agate when he sat in this court.
In Medical Expertise (supra), Judge Siegal cited with approval a definition of medical necessity provided by the New Jersey Supreme Court, to wit:
“[A] necessary medical expense under the [No-Fault] Act is one incurred for a treatment, procedure, or service ordered by a qualified physician based on the physician’s objectively reasonable belief that it will further the patient’s diagnosis and treatment. The use of the treatment, procedure, or service must be warranted by the circumstances and its medical value must be verified by credible and reliable evidence (Oceanside Med. Healthcare v Progressive Ins., 2002 NY Slip Op 50188[U], *5 [Civ Ct, Kings County, May 9, 2002], quoting Thermographic Diagnostics Inc. v Allstate Ins. Co., 125 NJ 491, 512, 593 A2d 768, 780 [1991].)
“It is not whether or not some ‘positive’ findings may be fashioned from the results of psychological tests, but rather could a psychologist hold an objective and reasonable belief that the tool used will further the patient’s diagnosis and treatment and whether that tool is warranted given the circumstances.” (196 Misc 2d at 395 [internal quotation marks omitted].)
In Fifth Ave. Pain Control Ctr., Judge Agate determined that medical necessity entailed
“treatment or services which are appropriate, suitable, proper and conducive to the end sought by the *440 professional health service in consultation with the patient. It means more than merely convenient or useful treatment or services, but treatment or services that are reasonable in light of the patient’s injury, subjective and objective evidence of the patient’s complaints of pain, and the goals of evaluating and treating the patient.” (196 Misc 2d at 807.)
He went on to say that
“for treatment or services to be medically necessary, it must be reasonably determined by the health care professional in consultation with the patient, that the treatment or services are consistent with the patient’s condition, circumstances and the best interest of the patient with regard to the type of treatment or services rendered, the amount of treatment or services rendered, and the duration of the treatment or services rendered.” (Id.)
Judge Agate went further, however, holding that in order to find that treatment or services are not medically necessary “it must be reasonably shown by medical evidence, in consideration of the patient’s condition, circumstances, and the best interest of the patient, that the treatment or services would be ineffective or that the insurer’s preferred health care treatment or lack of treatment would lead to an equally good outcome.” (Id. at 807-808 [emphasis added].)
While the defendant agrees that the testing as prescribed by the plaintiff provider herein was clearly medically necessary, as defined by both Judges Siegal and Agate, its defense of lack of medical necessity is seemingly based on a single word (ineffective) in Judge Agate’s opinion. Defendant argues that the test is inherently unnecessary due to a supposedly improper methodology used in conducting it. Plaintiff counters that, as conducted, the tests were medically necessary and done correctly and that even if they were done incorrectly or incompletely, such failures do not arise, at least in the context of no-fault litigation for provider payment, to the level of being medically unnecessary.
Defendant’s position seeks a retrospective determination of medical necessity but this court can find nothing in the precedents discussed or in the no-fault statute and related regulations that establish such a position. In fact, to the contrary, they seem to require a determination of medical necessity be made prospectively from the standpoint of the insured at the time a treatment or service is rendered, not at a time when its effectiveness or lack thereof can be established retrospectively.
*441 This is particularly true when one considers that the expenses sought in no-fault litigation are in reality expenses incurred by the insured, not the provider. A medical provider does not “incur” expenses when it treats an insured. Rather, the provider accepts an assignment of the insured’s benefits, allowing it to step into the shoes of the insured for litigation purposes. In theory, if not reality, the insured, not the provider, is the one seeking reimbursement for expenses already incurred. As such, the no-fault statute was clearly intended to “deliver better protection for the insured and to pay off claims quickly (NY Legis Ann, 1973, p 298)” (Pavone v Aetna Cas. & Sur. Co., 91 Misc 2d 658, 663 [Sup Ct, Monroe County 1977]), and no-fault regulations have been interpreted in favor of the insured’s rights (and through an assignment of benefits, the rights of the provider), especially as they relate toward speedy payment of proper claims on behalf of the insured. (See Presbyterian Hosp. in City of N.Y. v Maryland Cas. Co., 90 NY2d 274 [1997].)
To adopt defendant’s position, quite frankly, would be to dramatically and judicially change the very nature of no-fault litigation. It would result in these proceedings all too often delving into issues more related to medical malpractice or professional misconduct litigation, a fact reflected by defendant’s brief, which cites as authority a matter decided before the State Board of Professional Medical Conduct (see Matter of Dobson, 2006 NY Phys Dec LEXIS 411 [2006]). The nature of such litigation would defeat the very purpose of the no-fault statute which is “to permit liberal recovery of moneys actually expended in the treatment of accident-related injuries.” (Vidra v Shoman, 59 AD2d 714, 716 [2d Dept 1977]; see also Presbyterian Hosp. in City of N.Y. v Aetna Cas. & Sur. Co., 233 AD2d 431 [2d Dept 1996].) This is only reinforced by the Court of Appeals findings that the regulations “are written to encourage prompt payment of claims, to discourage investigation by insurers and to penalize delays.” (Dermatossian v New York City Tr. Auth., 67 NY2d 219, 225 [1986].)
Nowhere in the statutory or regulatory scheme are “necessary expenses” defined to exclude charges for services that were duly prescribed, but improperly or inadequately performed. Insurance Law § 5102 (a) (1) defines “basic economic loss” as including, inter alia, “[a] 11 necessary expenses incurred.” If either the legislature or the Superintendent of Insurance had intended that the determination regarding medical necessity should be made in hindsight, with regard for whether a proce *442 dure was properly performed, a statutory or regulatory change could be made to define necessary expenses as including payment for “properly performed medical procedures.” Neither has chosen to do so.
After a reading of the no-fault statutes and regulations, the precedents established by both Judge Siegal and Judge Agate and the testimony, evidence and briefs submitted in this matter, this court holds that even if defendant has demonstrated that a prescribed medical service or procedure may not have been conducted properly, reimbursement is warranted so long as said service or procedure was medically necessary. The issue of proper performance of such service or procedure is best left for other areas of litigation practice and/or, where appropriate, the State Board of Professional Medical Conduct.
The court further finds that the plaintiff in this matter, by stipulation of the parties, has established a prima facie case as to the medical necessity of the services rendered, thus shifting the burden of proof to the defendant to demonstrate, by a preponderance of the evidence, a lack of medical necessity for said services. Based on the testimony of the defendant’s own expert that the procedures in question, as prescribed, were, in fact, medically necessary and the rebuttal testimony of plaintiffs expert explaining how the tests, as actually performed, could be of benefit to the patient, the defendant has failed to meet that burden.
Therefore, the court finds in favor of the plaintiff in the amount of $2,832.14, plus statutory interest, attorney fees and costs and disbursements.