871 A.2d 156

JUNE PANNIEL, PLAINTIFF, v. FELIX DIAZ, JR. AND ROBERT WOOD JOHNSON UNIVERSITY HOSPITAL AT HAMILTON, DEFENDANTS.

Superior Court of New Jersey
Law Division Mercer County

Decided February 18, 2004.

598

*Steven Blader,* for Plaintiff (*Szaferman, Lakind, Blumstein, Blader, Lehmann & Goldshore,* attorneys).

*James J. Breslin, III,* for Defendants Felix Diaz, Jr. and Robert Wood Johnson University Hospital at Hamilton (*Lenox, Socey, Wilgus, Formidoni, Brown, Giordano & Casey,* attorneys).

*Lawrence N. Lavigne,* as General Counsel for Defendant Robert Wood Johnson University Hospital at Hamilton (*Norris, McLaughlin & Marcus,* attorneys).

SABATINO, J.S.C.

This case arises out of the recurring scenario in which the same insurance company happens to cover both vehicles involved in a roadway accident. As is often the case, plaintiff in this matter, a driver injured in the collision, pursued personal injury protection (PIP) medical benefits from her insurer in private arbitration, while also bringing a tort action in the Superior Court against the owner and driver of the other vehicle. After an extensive hearing at which both the plaintiff and the insurance company were represented by counsel, the PIP arbitrator concluded that plaintiff's primary injuries were proximately caused by the accident, and awarded her benefits.

The novel legal question before the court is whether principles of "offensive" collateral estoppel bind the defendant insureds in the Superior Court action to the PIP arbitrator's finding of proximate cause, in a situation where the plaintiff has agreed to limit her tort damages to the insurer's policy limits. Plaintiff argues that, in essence, the insurance company is the real party in

interest in defending the tort action, and that it should now be stuck with the adverse finding of causation from the arbitration.

For the legal, policy and practical reasons explained below, the court finds that the defendant insureds are not estopped by the PIP outcome from relitigating issues of proximate causation in this tort action.

## I.

On June 19, 2002, an automobile driven by plaintiff June Panniel was struck by an ambulance at an intersection in Hamilton Township, New Jersey. The ambulance was driven by defendant Felix Diaz, Jr., and was owned by defendant Robert Wood Johnson University Hospital at Hamilton ("RWJ"). Coincidentally, both Panniel and RWJ had separately insured their respective vehicles with New Jersey Manufacturers Insurance Company ("NJM").

Panniel was transported from the accident scene to Robert Wood Johnson University Hospital, where she was treated for chest and shoulder pain. The following day, June 20, 2002, plaintiff noticed a cut or laceration on the bottom of her right foot. After her own efforts to treat the wound were unsuccessful, plaintiff returned to the hospital and was admitted on July 2, 2002. Her admitting diagnosis was cellulites of the right foot and new onset diabetes. On July 12, 2002, twenty-three days after the accident, plaintiff underwent surgery on her right foot to remove the contaminated tissue. All five toes of plaintiff's right foot were amputated in that procedure.

Plaintiff also was diagnosed several months after the accident with carpal tunnel syndrome in her right arm. She sought pre-certification for carpal tunnel surgery from her PIP carrier, NJM.

By letter dated August 19, 2002, NJM informed her that "there is no PIP coverage available" because "the documented injuries and treatment are not motor vehicle accident related." The gist of NJM's position was that plaintiff had undiagnosed diabetes prior

to the accident, and that the pre-existing diabetes, coupled with her failure to seek prompt medical attention for the cut on her foot, led to the need for her foot surgery. NJM also contended that plaintiff's carpal tunnel condition was unrelated to the accident.

In response to NJM's denial letter, plaintiff's counsel sent a demand for PIP arbitration to the American Arbitration Association (AAA) on November 12, 2002. The AAA assigned the PIP case Docket No. 18–Z–600–19165–02. A week later, on November 19, 2002, plaintiff's same counsel filed this personal injury action on her behalf in the Superior Court (Docket No. MER–L–3657–02) against RWJ and Diaz.

NJM hired the law firm of Lenox, Socey, Wilgus, Formidoni, Brown, Giordano and Casey, LLC ("the Lenox firm") to defend it in the PIP dispute and also to defend its insureds, Diaz and RWJ, in the personal injury action. The parties exchanged simultaneous discovery addressing both the PIP and personal injury claims.

It is undisputed that defense counsel focused his discovery in both matters on the issue of the alleged nexus between the motor vehicle accident and the partial amputation of plaintiff's right foot. The defense obtained plaintiff's surgical and other hospital records, her MRI studies, and subpoenaed medical records from nine other providers who treated plaintiff before and after the motor vehicle accident.

Plaintiff served the defense with a narrative report from Ulysses Williams, Jr., M.D., a Board-certified internist who diagnosed the need for surgical resection of the toes on her right foot. Dr. Williams opined that plaintiff cut her foot in the accident and bacteria entered the open wound causing the infection that required her toes to be amputated.

Prior to the PIP arbitration hearing, defense counsel deposed plaintiff about her injuries, and also arranged for her to appear before Robert Carabelli, M.D., for an Independent Medical Examination. Dr. Carabelli was unable to support defense counsel's

position that plaintiff's right foot injury was unrelated to the motor vehicle accident.[1] Defense counsel thereafter obtained an expert report from Angelo Scotti, M.D., a Board-certified infectious disease and emergency medicine specialist. Dr. Scotti concluded from his review of the medical records that plaintiff's right foot infection and the ensuing amputation were not the result of the accident. He cited the non-involvement in the collision of any sharp object that could have pierced through her shoe, the lack of foot symptoms or any abnormal findings concerning plaintiff's foot at the emergency room, and plaintiff's pre-existing diabetes.

The PIP arbitration hearing was held on July 17, 2003. The arbitrator, also known under AAA rules as the Dispute Resolution Professional ("DRP"), was Michael F. Carnevale, II, Esq., an attorney. The arbitration was conducted in person rather than telephonically. The arbitrator heard live testimony from both Panniel and from her physician Dr. Williams, both of whom were examined and cross-examined by counsel. The arbitrator also considered the defense expert reports from Dr. Scotti and Dr. Carabelli, as well as what he described as "substantial" medical records and reports, including plaintiff's entire hospital record.

Following the PIP arbitration hearing, defense counsel submitted a supplemental letter along with a July 13, 2002 hospital record of Marc Whitman, M.D., who saw the patient for purposes of antibiotic management after her foot surgery earlier that day. In a segment of that post-surgical report, Dr. Whitman described plaintiff's condition as involving a "severe diabetic foot infection." [2]

---

[1] However, Dr. Carabelli did conclude that the accident did not cause any carpal tunnel injury in plaintiff's right hand.

[2] After the arbitration hearing, defense counsel obtained a report from a third medical expert, Aaron Sporn, M.D., a Board-certified orthopedist. Upon examining plaintiff on July 30, 2003, Dr. Sporn determined that he could not supply "a definitive opinion regarding the possible cause or relationship of the ... accident to the foot infection that developed." He did note that "if there was indeed an injury to the right foot and ankle on June 19, 2002, then it probably initiated a process that led to an infection and ultimately to a trans-metatarsal

On September 29, 2003, Arbitrator Carnevale transmitted a four page written decision to the parties. His decision found that Panniel was injured in an automobile accident on June 19, 2002, while insured by NJM. The decision further concluded that, "based on the credible medical evidence ... the expenses related to the care of the right leg and foot and ultimate amputation are causally related to the automobile accident [and are] payable as medical expense benefits, and are subject to relevant fee schedule, copay and deductible." Arb. Decision at 2, ¶ 3.

The arbitrator specifically found Dr. Williams' testimony to be "particularly informative, credible and helpful." *Id.* at ¶ 2. He observed that:

> *Dr. Williams opined, after lengthy testimony and skillful cross-examination by respondent's [defense] counsel, credibly and convincingly* that JP [plaintiff] was an undiagnosed diabetic at the time of the accident, sustained a small (too small to be noted in the emergency room records) cut to the leg, which in turn, due to the diabetic condition[,] resulted in infection, cellulitis and ultimately transmetarsal amputation.

*Id.* at 2, ¶ 2 (emphasis added). The arbitrator found the competing opinions from Dr. Scotti to be "significantly less helpful than Dr. Williams' testimony on this point." *Id.* at ¶ 3. The arbitrator also noted that the defense IME examiner, Dr. Carabelli, supported plaintiff's view of causation with respect to the amputation. *Ibid.* The arbitrator did not comment, however, on Dr. Whitman's post-surgery impression of a "diabetic" foot infection.

---

amputation." (emphasis in original). Thereafter, defense counsel supplied Dr. Sporn with a copy of plaintiff's deposition, which led him to write a supplemental report on September 27, 2003. In the supplemental report, Dr. Sporn opined that plaintiff's own delay in seeking medical care for her foot was "contributory" to the final outcome, and that "perhaps the amputation even [could have been] avoided."

The record shows that defense counsel did not submit Dr. Sporn's reports to the PIP arbitrator, and did not turn them over to plaintiff's counsel until after the arbitration award was rendered. Presumably, defense counsel will attempt to rely upon Dr. Sporn's testimony in the tort action as proof of plaintiff's comparative fault under the doctrine of avoidable consequences. *See Model Jury Charge (Civil),* 6.11C (2000).

As to the carpal tunnel claim, however, the arbitrator sided with the defense. The arbitrator acknowledged that "there is no real dispute that [plaintiff] may have carpal tunnel, or that ... surgery may be medically necessary." *Id.* at 2, ¶ 4. Nonetheless, the arbitrator found that the credible medical evidence, including plaintiff's own testimony, showed that the carpal tunnel complaints did not appear until long after the accident. *Ibid.* This led the arbitrator to find that "the complaints of carpal tunnel syndrome[,] while real, are not causally related to the automobile accident," and that "the denial of [the] precertification request was proper." *Ibid.*

Neither plaintiff nor NJM timely pursued an appeal of the arbitrator's decision. *See AAA New Jersey No-Fault Arbitration Rules ("AAA Rules")(eff. May 1, 2003)*, at Rule 36 (allowing limited appeals of a DRP's decision shown to be incorrect as a matter of law). Accordingly, the arbitrator's resolution is now final. *See N.J.S.A.* 39:6A-31.

Having substantially prevailed in the PIP arbitration, plaintiff filed a motion for partial summary judgment on October 23, 2003. The motion seeks to preclude the defendants in the tort action from relitigating the arbitrator's finding that the plaintiff's amputation was proximately caused by the motor vehicle accident. In connection with that motion, plaintiff has certified that she will not seek any damages from defendants RWJ and Diaz in excess of the $1 million in liability coverage afforded under their policy with NJM. Defendants RWJ and Diaz oppose the motion, principally arguing that they were not parties to the PIP arbitration and therefore cannot be fairly bound by any of the arbitrator's findings.

Oral argument in this matter was initially heard on November 21, 2003. At that oral argument, defense counsel confirmed that neither RWJ nor. Diaz had prior notice of the PIP arbitration proceedings. In light of that revelation, this court continued the argument to a second date. It did so in order to explore more

fully the discrete interests, if any, of RWJ and Diaz that may remain in this lawsuit, apart from NJM's $1 million in coverage.

Shortly thereafter, RWJ's general counsel, Lawrence Lavigne, Esq., submitted a certification from Andrew Greene, President and Chief Executive Officer of the Robert Wood Johnson Health Network. Greene certifies that RWJ could still be adversely affected by a judgment for plaintiff in this case, even though plaintiff has agreed to cap her recovery at the NJM policy limits.

Greene advises that RWJ no longer procures liability coverage through NJM. Instead, RWJ is presently covered, in combination with Children's Specialized Hospital ("CSH"), as a shareholder in a captive malpractice and general liability company with other hospitals, through System and Affiliate Members, Ltd. ("SAAML"). According to Greene, a judgment against RWJ in this case will likely affect the future underwriting rating of both RWJ and CSH as a "single cell" under the SAAML umbrella. Moreover, Greene asserts that any judgment would decrease the amount of remaining coverage available to RWJ under the aggregate claims limit of the NJM policy for any other claims asserted for calendar year 2002. At the Court's invitation, RWJ's general counsel Levigne appeared at the second oral argument to address these points.[3]

Plaintiff does not refute these underwriting and coverage consequences. Instead, plaintiff argues that RWJ and. Diaz are in privity with NJM, and that RWJ and Diaz were "virtually" represented at the PIP arbitration by the very same attorney defending them in the tort action. She also urges that defense counsel had ample opportunities and incentives to disprove causation at the arbitration, and that it would be wasteful and unfair for this court to require plaintiff to prove causation a second time.

---

[3] Co-defendant Diaz did not appear at oral argument, through personal counsel or otherwise. However, his assigned counsel from the Lenox law firm did notify Diaz of the argument date and his right to be heard individually if he so desired.

In support of those arguments, plaintiff relies heavily on *Habick v. Liberty Mut. Fire Ins. Co.*, 320 *N.J.Super.* 244, 727 *A.2d* 51 (App.Div.1999), in which the court precluded a plaintiff who lost a causation dispute before a PIP arbitrator from relitigating those causation issues in her separate lawsuit against her insurer for uninsured motorist (UM) benefits. Defendants, on the other hand, argue that *Habick* is factually distinguishable, and that its reasoning should not be extended to the present circumstances.

## II.

The doctrine of collateral estoppel is an equitable doctrine designed to "promote efficient justice by avoiding the relitigation of matters which have been fully and fairly litigated and fully and fairly disposed of." *Barker v. Brinegar,* 346 *N.J.Super.* 558, 566, 788 *A.2d* 834 (App.Div.2002). New Jersey follows Section 27 of the *Restatement (Second) of Judgments* (1982) respecting collateral estoppel, and thus for the doctrine to apply to foreclose the relitigation of an issue, the party asserting the bar must show that:

(1) the issue to be precluded is identical to the issue decided in the prior proceeding;

(2) the issue was actually litigated in the prior proceeding;

(3) the court in the prior proceeding issued a final judgment on the merits;

(4) the determination of the issue was essential to the prior judgment; and

(5) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding. [*Sacharow v. Sacharow,* 177 *N.J.* 62, 826 *A.2d* 710, (2003); *In re Estate of Dawson,* 136 *N.J.* 1, 20–21, 641 *A.2d* 1026 (1994).]

Even if all of these stated elements of collateral estoppel are met, a court can decide not to apply the doctrine where there are sufficient countervailing interests, or if it would not be fair to do so. *In re Coruzzi,* 95 *N.J.* 557, 568, 472 *A.2d* 546 (1984). It remains essential that the party to be bound by the former adjudication have "fair notice and be fairly represented in the prior proceeding [;] [p]reclusion can only occur [w]hen an issue of fact or law is actually litigated and determined by valid and final

judgment." *Sacharow, supra,* 177 *N.J.* at 77, 826 *A.*2d 710 (internal citations omitted).

Here, viewing the motion record in a light most favorable to defendants as the nonmoving parties, *see R.* 4:46–1 *et seq.,* the court believes that at least the first four of these five collateral estoppel factors are met.

■ First, the issue of proximate causation of the partial amputation of plaintiff's right foot is substantively identical in both the PIP arbitration proceeding and in this personal injury case. Defendants contend that the issue in the PIP arbitration was whether or not there was a "substantial nexus" between plaintiff's foot injury and the automobile accident, which they argue is somehow different from the standard for proximate cause in a personal injury case. To be sure, the arbitrator's decision does not parrot the words of the Model Civil Jury Charges for proximate causation. *See Model Jury Charge (Civil),* 7.10 to 7.14. The arbitrator found that the plaintiff's right leg and foot injury and ultimate amputation were "causally related" to the automobile accident. Arb. Decision at 2–3.

This court finds no substantive difference in what was or is at stake in the two proceedings concerning causation.[4] It is for the finder of fact in both matters to determine whether the motor vehicle accident of June 19, 2002 was a substantial factor in causing plaintiff's right foot to be partially amputated. The

---

[4] There are, of course, various other issues that are to be decided in the personal injury action that were not decided in the PIP arbitration, such as negligence and comparative negligence of the respective drivers, the verbal threshold for non-economic damages, and pain and suffering. Likewise, the issue of the reasonableness of plaintiff's medical expenses under the PIP fee schedule will not be before the civil jury in the personal injury case.

Those variations do not affect the court's analysis of the overlapping issue, i.e., whether the auto accident was a proximate cause of plaintiff's need for foot surgery. Plaintiff moved for partial, not complete, summary judgment to obtain preclusive treatment solely as to that causation issue. The court rejects defendants' contention that the presence of other issues in the case forecloses the application of collateral estoppel on the common issue.

arbitrator has already made that call, having been "credibly and convincingly" persuaded by plaintiff's expert, Dr. Williams, that the accident led to the amputation.

Defendants now wish, through the post-arbitration reports of Dr. Sporn, to dilute their role in the chain of causation. They argue that plaintiff contributed to her harm through her own delay in obtaining medical attention for her foot. That argument goes to distinct questions of comparative fault and the mitigation of damages. *See Ostrowski v. Azzara,* 111 *N.J.* 429, 437–38, 545 *A.2d* 148 (1988)(reciting the doctrine of "avoidable consequences" for a bodily injury).[5] It does not undermine the arbitrator's core finding that the accident was a (if not the sole) proximate cause of the foot injury. Whether or not defendants are due some offset because of plaintiff's own conduct would be an open issue for the jury trial, but the threshold question of causation from the accident is substantively identical in both proceedings.

With respect to the second and third elements of the *Restatement* test, the doctrine requires the identical issue to have been "actually litigated" in the prior proceeding and that a court in the prior proceeding issued a "final" judgment on the merits. These factors are easily satisfied here.

In *Kozlowski v. Smith,* 193 *N.J.Super.* 672, 475 *A.2d* 663 (App.Div.1984), the Appellate Division held that collateral estoppel may prevent a litigant in a personal injury action from relitigating a fact in issue determined against that litigant in a PIP action against her insurer in the Superior Court. In *Kozlowski,* the trial judge in the PIP case found that plaintiff's cardiac condition had not been caused by the motor vehicle accident. Following that adverse ruling, the trial court in the personal injury action held that plaintiff was collaterally estopped from linking the cardiac

---

[5] The doctrine of avoidable consequences "proceeds on the theory that a plaintiff who has suffered an injury as the proximate result of a tort cannot recover for any portion of the harm that by the exercise of ordinary care he could have avoided." *Ostrowski, supra,* 111 *N.J.* at 437, 545 *A.2d* 148.

condition to the accident. The Appellate Division upheld that result, finding that plaintiff had a "full and fair opportunity to present whatever evidence she had in the manner she chose. She had her day in court in the issue in question." *Id.* at 675, 475 *A.2d* 663. The causation issue had been actually litigated in the PIP action, resulting in a final judgment.

In *Habick v. Liberty Mut. Fire Ins. Co., supra,* 320 *N.J.Super.* at 258, 727 *A.2d* 51, these concepts of collateral estoppel were applied in the context of a PIP arbitration. The plaintiff in *Habick* had been injured in a motor vehicle accident with an uninsured driver. Her doctors recommended that she have her right knee surgically replaced. Her insurer, Liberty Mutual, disputed the causal nexus of the planned knee replacement surgery to the accident, and denied payment for the procedure. Plaintiff requested arbitration of the PIP claim. Plaintiff also filed for uninsured motorists (UM) coverage against Liberty Mutual, a claim that was routed to a separate UM arbitration. Liberty Mutual prevailed in the PIP arbitration on the causation issue, and the insurer sought to have that finding given preclusive effect in the UM matter. The Appellate Division agreed with the insurer, concluding that plaintiff was collaterally estopped by the PIP arbitrator's ruling on causation from relitigating that issue in the UM case.

*Habick* acknowledged the preclusive effect of an arbitration when the party to be bound has had an ample chance to be heard in the arbitral forum. The guiding principle, according to *Habick,* is that the party to be bound had a " 'full and fair opportunity to litigate the issue' in the earlier proceeding." *Id.* at 257, 727 *A.2d* 51. In that vein, *Habick* relied upon Section 84 of the *Restatement (Second) of Judgments,* which allows for the preclusive effect of a valid and final award by arbitration. *Id.* at 258, 727 *A.2d* 51; *see also Konieczny v. Micciche,* 305 *N.J.Super.* 375, 384, 702 *A.2d* 831 (App.Div.1997) ("In appropriate circumstances, arbitration awards may be given collateral estoppel effect in subsequent judicial proceedings."). Section 84 provides that "a valid

and final award by arbitration has the same effects under the rules of res judicata, subject to the same exceptions and qualifications, as a judgment of a court." *Restatement (Second) of Judgments*, § 84.

Here, there is no doubt that the issue of whether the June 19, 2002 auto accident caused Panniel's foot injury was "actually litigated" before the PIP arbitrator. Indeed, that was a central issue in the arbitration. Both parties put on competing proofs from medical experts on the issue. The arbitrator noted that the plaintiff's expert, Dr. Williams, testified at length and was subjected to "skillful cross-examination" by defense counsel. Moreover, the PIP arbitrator's decision is "final" because under the Auto Arbitration Act, *N.J.S.A.* 39:6A–31, his decision is binding and there is no right to seek a trial de novo in the Superior Court. *See Churm v. Prudential Prop. & Cas. Ins. Co.*, 276 *N.J.Super.* 631, 632–33, 648 *A.2d* 741 (App.Div.1994). As noted above, the parties waived any further internal review of the award by a DRP panel of the AAA.

The fourth element of the collateral estoppel test is whether the arbitral finding that the accident proximately caused the partial amputation of plaintiff's right foot was or is "essential" to both the PIP award and to this personal injury action. The court readily finds that to be so. Without that causation finding, the arbitrator could not have awarded plaintiff her medical expenses for the foot surgery. Likewise, a jury in the tort action would have to decide whether the auto accident was the proximate cause of the plaintiff's injuries, as an essential element to an award of damages for those injuries. *See Model Jury Charge (Civil)*, 7.10 (1998); *see also Fama v. Yi*, 359 *N.J.Super.* 353, 820 *A.2d* 65 (App.Div.2003) (precluding a motorist in a PIP action from arguing that his injuries and medical expenses were related to his auto accident, given the "essential" previous finding by a jury in his personal injury action that the accident was not a proximate cause of those injuries); *Habick v. Liberty Mut. Fire Ins. Co., supra*, 320 *N.J.Super.* at 247–62, 727 *A.2d* 51 (declaring a PIP arbitra-

tor's determination of lack of causation final, noting that the causation issue had been fully litigated before the arbitrator).

The harder question before the court revolves around the fifth element of the *Restatement*'s test: whether the party against whom collateral estoppel is asserted in this litigation was a party or in privity with a party to the earlier proceeding. Although courts traditionally confined application of collateral estoppel to cases in which the parties were the same in both proceedings, the modern trend favors "a more pragmatic, case-by-case approach" to mutuality of parties. *Zirger v. Gen. Accident Ins. Co.*, 144 *N.J.* 327, 337–38, 676 *A*.2d 1065 (1996).

In *Zirger*, the Supreme Court held that an underinsured motorist (UIM) carrier that had notice of a pending auto negligence action by its insured against the other driver in the accident could be bound by the jury's findings in that negligence case. The Court found that "ordinarily there will be a sufficient identity of interests between the third-party tortfeasor's carrier and the UM/UIM carrier to justify according preclusive effect to the result of a damages verdict in the litigation between the injured plaintiff and the tortfeasor." *Id.* at 339, 676 *A*.2d 1065. *Zirger* noted that the UIM carrier could protect its interests by seeking permissive intervention in the negligence action, a measure which, if granted, would obviate the need to relitigate questions of fault and damages in a separate UIM case. *Id.* at 341–42, 676 *A*.2d 1065.

As the Court recognized in *Zirger*, "[t]he concept of privity, as well as its parameters, is necessarily imprecise." *Id.* at 338, 676 *A*.2d 1065. "It is merely a word used to say that the relationship between the one who is a party on the record and another is close enough to include that other within the res judicata." *Ibid.* (citing *Bruszewski v. United States*, 181 *F*.2d 419, 423 (3d Cir.) (Goodrich, J., concurring), *cert. denied*, 340 *U.S.* 865, 71 *S.Ct.* 87, 95 *L.Ed.* 632 (1950)). "A relationship is usually considered 'close enough' only when the party [against whom collateral estoppel is asserted] is a virtual representative of the non-party, or when the non-party actually controls the litigation."

*Ibid.* (citing *Collins v. E.I. DuPont de Nemours & Co.,* 34 *F.*3d 172, 176 (3d Cir.1994)).

A mere connection between the parties in interest in two proceedings may not be sufficient to establish privity for purposes of collateral estoppel. For example, in *Pace v. Kuchinsky,* 347 *N.J.Super.* 202, 789 *A.*2d 162 (App.Div.2002), the Appellate Division ruled that there was an insufficient nexus between an injured motorist and one of his treating physicians to impose upon the motorist the adverse result of an earlier PIP arbitration pursued by that physician against plaintiff's PIP carrier. The plaintiff was merely a witness at the PIP arbitration, and was not represented in that proceeding by his own counsel. The arbitrator did not alert plaintiff that the outcome in the PIP arbitration might foreclose his right to prove causation in his pending tort action against the other motorist. Under those circumstances, the Appellate Division in *Pace* found that the "real party in interest" in the PIP matter was plaintiff's doctor who wanted his bills paid, not the plaintiff. *Id.* at 217, 789 *A.*2d 162. Hence, the court found insufficient privity between the plaintiff and her doctor to preclude her from relitigating issues of causation in her personal injury case. *Ibid.*

Here, the parties are not identical. Panniel was the claimant in the PIP arbitration and is the plaintiff in this personal injury action. She was represented by the same attorney in both proceedings. However, the respondent defending the PIP action was NJM, her PIP carrier, whereas the named defendants in this tort action are Felix Diaz, Jr., and RWJ. Neither RWJ nor Diaz was a party to the PIP arbitration. Indeed, it is undisputed that they had no notice of that proceeding, either from the arbitration tribunal or from the Lenox law firm.

The question then becomes whether there is privity between NJM, on the one hand, and Diaz and RWJ on the other. As described in *Zirger,* is the relationship between NJM and its insureds named as defendants in the auto case "close enough" to

support a finding of privity? That privity analysis is affected by a variety of facts and circumstances in the record.

It is clear that NJM, through its counsel, controlled the defense of the PIP arbitration. NJM decided which discovery to pursue, which doctors to conduct IME reviews of the plaintiff's medical condition, and which proofs to present at the PIP arbitration. NJM also retained the sole discretion to contest the PIP claims, to pay them in full, or to compromise them. RWJ and Diaz would have no right to interfere with NJM's decisions on those matters.

On the other hand, NJM and the present defendants have had a common interest in disproving plaintiff's claims of causation. If NJM had succeeded in persuading the PIP arbitrator that Panniel's right foot condition was unrelated to the motor vehicle accident, RWJ and Diaz would have been able to take advantage of those findings in this tort action. That is the natural implication of *Kozlowski* and *Habick,* which estopped plaintiffs who had failed to prove causation in their PIP cases from relitigating those causation issues in the UM context. NJM, Diaz and RWJ all would have a shared desire for plaintiff to lose the PIP arbitration. Likewise, if the tort action had been tried first before the PIP case, NJM presumably would hope that plaintiff would fail in proving causation to the jury, and then invoke that adverse finding to its benefit in the PIP action.

The overlap of defense interests here is heightened by several additional factors. First, NJM happens to be the insurer of both vehicles involved in the accident. Thus, it has the dual status as the respondent on the plaintiff's PIP claims and as the insurer of the defendants in the tort action. Pursuant to its liability policy with RWJ and Diaz, NJM would have the right to control the defense of the tort action. Indeed, NJM engaged the very same law firm to serve as defense counsel in both cases.

Further, plaintiff has disavowed any right of recovery beyond NJM's policy limits in the tort action. That eliminates the possibility that RWJ or Diaz would be exposed to an excess verdict

payable out of their own assets. Any judgment would be paid solely by NJM.

Given these various characteristics, the court concludes that NJM is sufficiently in privity with its insureds, RWJ and Diaz, to satisfy the fifth element of the *Restatement* test. That determination, however, does not end the court's analysis. Collateral estoppel is not to be applied mechanically. Even where all of the required elements for preclusion are present, countervailing factors may call for restraint.

 Specifically, there are five recognized exceptions to collateral estoppel listed in Section 28 of the *Restatement (Second) of Judgments* (1982), all of which are recognized by New Jersey case law. *See Ensslin v. Tp. of North Bergen*, 275 *N.J.Super.* 352, 370, 646 *A.2d* 452 (App.Div.1994). At least one of those exceptions [6] warrants close attention in the present case. In particular, collateral estoppel should not be imposed where:

> (5) [t]here is a clear and convincing need for a new determination of the issue (a) because of the potential adverse impact of the determination on the public interest or the interests of persons not themselves parties in the initial action, (b) because it was not sufficiently foreseeable at the time of the initial action that the issue would arise in the context of a subsequent action, or (c) because the party sought to be precluded, as a result of the conduct of his adversary or other special circum-

---

[6] The other four exceptions are: (1) the party against whom preclusion is sought could not, as a matter of law, have obtained review of the judgment in the initial action; (2) the issue is one of law and (a) the two actions involve claims that are substantially unrelated, or (b) a new determination is warranted in order to take account of an intervening change in the applicable legal context or otherwise to avoid inequitable administration of the laws; (3) a new determination of the issue is warranted by differences in the quality or extensiveness of the procedures followed in the two courts or by factors relating to the allocation of jurisdiction between them; or (4) the party against whom preclusion is sought had a significantly heavier burden of persuasion with respect to the issue in the initial action than in the subsequent action; the burden has shifted to his adversary; or the adversary has a significantly heavier burden than he had in the first action. See *Ensslin, supra,* 275 *N.J.Super.* at 370, 646 *A.2d* 452. Because the application of the fifth exception suffices to dispose of plaintiff's motion, the court does not reach these other four exceptions.

stances, did not have an adequate opportunity or incentive to obtain a full and fair adjudication in the initial action.

[*Ibid.*]

The court finds subparts (a) and (c) of this exception germane to the present case. It turns first to subpart (a): "potential adverse impact ... on the public interest or the interests of persons not themselves parties in the initial action." In terms of private justice, the court is mindful of the adverse follow-on consequences that could befall RWJ and Diaz if the PIP arbitrator's finding of causation is foisted upon them in this tort action. If, for example, the preclusive finding of causation leads to a plaintiff's verdict, the damages awarded for her five amputated toes and her associated pain and suffering may well be considerable. As RWJ's affiant explains, such a verdict would reduce its remaining aggregate coverage from NJM for policy year 2002. The verdict could also damage RWJ's rating in its current self-insurance pool, and might even affect another hospital in the same risk cell within that pool.

Similarly, Diaz has something to lose at trial as well. Even though NJM would protect him up to its policy limits and plaintiff has waived any claims above that amount, there could be adverse underwriting consequences for Diaz if a jury finds that his operation of the ambulance resulted in a major injury to the plaintiff. A large verdict might, for instance, affect Diaz's own personal automobile insurance rates in the future, or his ability to procure coverage in the private insurance market.

A preclusive finding of causation for plaintiff's amputated toes could have a pivotal impact at trial. Counsel has informed the court that plaintiff is subject to the verbal threshold for non-economic damages under the Automobile Insurance Cost Reduction Act (AICRA), *N.J.S.A.* 39:6A–8. Plaintiff is thus required to prove either that she suffered an injury from the accident which resulted in dismemberment, *see N.J.S.A.* 39:6A–8(a), or an injury that is permanent and has caused a serious impact on her activities of daily living, *see N.J.S.A.* 39:6A–8(a); *James v. Torres,* 354

*N.J.Super.* 586, 596, 808 *A.2d* 873 (App.Div.2002). The threshold would seem to be easily surmounted by plaintiff's amputation. If, however, the loss of her toes were found by the jury to be unrelated to the accident, plaintiff's soft-tissue neck and back injuries from the collision may well be inadequate to vault the threshold. Hence, the presence or absence of a causal link between plaintiff's foot injury and the auto accident could be dispositive of the verbal threshold, and thus serve as the linchpin between a no-cause verdict and a substantial award for pain and suffering. Precluding a full trial on causation issues would realistically deprive RWJ and Diaz of the chance for an award of zero damages, a result they would certainly prefer with or without NJM's indemnity protection.

The court also considers the potential impact on the public interest. If it applies collateral estoppel to insured defendants in circumstances such as these, such an approach might produce undesirable ripple effects within our automobile insurance system. For example, the PIP arbitration process could become unwieldy if an arbitrator's findings of causation favorable to a PIP plaintiff were routinely exported to such plaintiffs' personal injury actions against third parties. Such a rule of law could lead defense counsel and their carriers to resist PIP claims even more aggressively, since the PIP case would be the final chance for anyone to prove or disprove causation of an injury. This very well could lead to more discovery, more adversity and more formality in the PIP arbitration process, a process that was legislatively intended to be expeditious. The PIP statute is to "be liberally construed to effect the prompt and efficient payment of benefits for victims of auto accidents." *Elkins v. New Jersey Mfrs. Ins. Co.,* 244 *N.J.Super.* 695, 700, 583 *A.2d* 409 (App.Div.1990). The objective of PIP legislation is "to get needed money to injured people quickly." CYNTHIA M. CRAIG & DANIEL J. POMEROY, *NEW JERSEY AUTO INSURANCE LAW: NO FAULT (PIP), UNINSURED & UNDERINSURED MOTORISTS* 10 (2004). The statute was enacted "to provide a prompt source of first-party recovery for losses sustained in automobile accidents," *id.* at 61, and to "minimize resort to the

judicial process." *Gambino v. Royal Globe Ins. Co.,* 86 *N.J.* 100, 107, 429 *A.*2d 1039 (1981); *see also Habick, supra,* 320 *N.J.Super.* at 260–61, 727 *A.*2d 51 ("PIP arbitration is intended to permit 'expeditious' recovery of medical bills incurred as a result of an auto accident."). These goals of speed and efficiency would be undermined if PIP arbitrations were bogged down with the plenary trappings of a Superior Court lawsuit for personal injury damages.

Of course, these policy concerns are tempered by the fact that, under present case law as set forth in *Habick,* a plaintiff in a PIP arbitration has only a limited amount to gain (payment of medical expenses) and potentially much more to lose (a preclusive finding of lack-of-causation). This might suggest that notions of reciprocity require collateral estoppel to be applied in a reverse situation.

However, our courts have at times withheld the imposition of collateral estoppel on a plaintiff where doing so would work an extreme injustice. For example, in *Barker v. Brinegar, supra,* 346 *N.J.Super.* at 568, 788 *A.*2d 834, the plaintiff failed to persuade the PIP arbitrator that her lower back complaints and decompression surgery were related to the subject motor vehicle accident. Despite repeated efforts, plaintiff was unable to procure before the arbitration hearing a supporting diagnostic report from her treating orthopedic surgeon. Eventually, the surgeon generated such a report, some eleven months after the arbitration. Under those circumstances, the Appellate Division declined to bar plaintiff from offering proof of causation at the trial of her personal injury action. It held that "while considerations of efficiency. may have suggested giving preclusive effect to the arbitration proceedings, the overarching principles of fairness and justice require a different result." *Ibid.; see also Pace v. Kuchinsky, supra,* 347 *N.J.Super.* at 217, 789 *A.*2d 162 (reversing the preclusive imposition of a PIP "cutoff date," as previously determined by a PIP arbitrator, to the patient's tort action, remarking upon "equitable considerations" that justified giving the injured plaintiff a chance

to prove in the tort action that her injuries from the accident continued beyond the cutoff date).

Moreover, under subpart (c) of the *Restatement*'s fifth exception, the court should consider whether "the party sought to be precluded, as a result of the conduct of his adversary or other special circumstances, did not have an adequate opportunity or incentive to obtain a full and fair adjudication in the initial action." *Restatement (Second) of Judgments* § 28(5)(c); *see also Ensslin v. Tp. of North Bergen, supra*, 275 *N.J.Super.* at 370, 646 *A.2d* 452. Viewing the totality of circumstances here, the court believes that it would be unfair to RWJ and Diaz to foist upon them the PIP arbitrator's finding of causation.

Although RWJ and Diaz had certain goals in common with their insurer, NJM, their interests, as pointed out at pages 23 to 25 above, were not entirely synonymous. NJM, as is its prerogative, chose to defend the PIP claim to the hilt rather than compromising it in some fashion. This led to the necessity for the PIP arbitrator to make findings on causation, findings that conceivably could have much broader effect in the third-party tort action. NJM, for reasons not clear in the record, chose to present its competing medical expert on causation, Dr. Scotti, through the contents of his written report rather than through live testimony, even though plaintiff's own medical expert, Dr. Williams, testified before the arbitrator in person. None of that was disclosed to RWJ or to Diaz before the arbitration was completed. In fact, RWJ and Diaz were not even aware that the arbitration was taking place.

Even if RWJ and Diaz had been notified of the pending PIP arbitration and of defense counsel's intended strategy for handling that proceeding, there is no provision in the AAA rules that would have allowed them to intervene in the arbitration if they wanted to do so.[7] This makes their circumstances distinguishable from

---

[7] At most, Rule 15 of the AAA procedures simply provides that "[p]ersons having a direct interest in the arbitration are entitled to *attend* the hearing."

those in *Zirger*, in which the Supreme Court noted that a UM/UIM insurer can protect itself against the preclusive effects of a personal injury action in the Superior Court against a tortfeasor driver by moving to intervene in that lawsuit pursuant to *R.* 4:33–2. *See Zirger, supra,* 144 *N.J.* at 342, 676 *A.2d* 1065.

As a practical matter, it is unlikely that insured drivers would want to devote the time and effort (and perhaps the expense of personal counsel) to intervene in PIP arbitrations concerning the injured driver's medical bills. Even an institutional entity such as RWJ would not be apt to get involved very often, if at all, in a PIP arbitration process in which its interests were only indirectly at stake. As a policy matter, such interventions would negate the efficiency of the arbitration process. Even so, it is instructive to recognize that the option of intervention, which became the key factor in the Court's analysis in *Zirger, Supra,* 144 *N.J.* at 342, 676 *A.2d* 1065, is not present here. RWJ and Diaz simply did not have a full and fair opportunity to be heard at the arbitration.

Further, the court does not hinge its reasoning on the fact that the same law firm retained by NJM to defend the PIP arbitration was also simultaneously engaged by NJM to defend RWJ and Diaz in the Superior Court action. Presumably, the Lenox law firm was retained to defend both matters for reasons of efficiency. Having one law firm handle both matters surely reduces the duplication of attorney time in case preparation and in the coordination of tasks. Plaintiff herself took advantage of similar efficiencies in having the same counsel represent her in the PIP case and in her tort case. To be sure, the Lenox firm had concurrent clients as of the date it appeared at the arbitration: as counsel for NJM and as counsel for RWJ/Diaz. Although the matters were related, the law firm had no apparent conflict in simultaneously

---

*AAA No–Fault Automobile Arbitration Rules* (eff. May 1, 2003)(emphasis added). The arbitrator also has discretion to determine the propriety "of the *attendance* of other persons." *Ibid.* (emphasis added). The right to attend a hearing is a far cry from the right to participate, examine witnesses, submit proofs, make arguments, and so on.

representing both sets of clients. *See RPC* 1.7 and *RPC* 1.9 (prohibiting conflicts arising out of "direct adversity" or where the lawyer's representation of another client would "materially limit" his service of the other client).

Plaintiff has argued that because the Lenox law firm was counsel to both NJM and to NJM's insureds, RWJ and Diaz, as of the date of the PIP arbitration, there is no unfairness in binding RWJ and Diaz to the outcome of the PIP case. In essence, plaintiff conceives of the Lenox attorney as an agent of RWJ and Diaz at the PIP arbitration. The court respectfully disagrees. Even though the Lenox firm was concurrently representing RWJ and Diaz in the personal injury case, its advocacy role at the PIP arbitration was confined to its representation of NJM.

Indeed, were this court to find the law firm's dual representation to be the pivotal factor here for purposes of collateral estoppel, such a ruling might discourage insurers in the future from assigning a PIP defense to the same law firm that would handle the defense of the related liability case. That, in turn, could lead to the wasteful duplication of attorney time and complicate the coordination of discovery in the PIP action and in the third-party tort action. For these reasons, the court declines to rely on the dual representation of defense counsel here as a reason for imposing collateral estoppel.

In sum, the court believes that there is "a clear and convincing need for a new determination" in the tort action as to whether Panniel's right foot injury, and the subsequent amputation of her toes, was or was not proximately caused by the June 19, 2002 motor vehicle accident. *See Ensslin, supra,* 275 *N.J.Super.* at 370, 646 *A.*2d 452. The doctrine of collateral estoppel should not be applied here to the disadvantage of defendants RWJ and Diaz on that crucial issue, because there are "sufficient countervailing interests" and "it would not be fair to do so." *See In re Coruzzi, supra,* 95 *N.J.* at 568, 472 *A.*2d 546.

By its ruling, the court does not suggest that collateral estoppel would be unavailable against *NJM.* For instance, if the sequence

of proceedings had been reversed, this court sees no apparent unfairness in imposing a jury finding of causation from the tort action upon NJM in a subsequent PIP case. Likewise, the court finds that NJM presumptively would be estopped by its loss in the PIP arbitration from relitigating causation if plaintiff had a UM or UIM claim against NJM arising out of this same auto accident. The holding is limited to the question of preclusion against NJM's insureds in a third-party personal injury action.

### III.

As a final comment, the court is well aware that its decision will lead in this case to the repeat presentation of certain proofs that were already considered by the PIP arbitrator. There is also the possibility for seemingly inconsistent outcomes, for the jury may disagree with the arbitrator and find that plaintiff's right foot injury was not proximately caused by the motor vehicle accident. Despite those considerations, the court believes that defendants RWJ and Diaz are entitled to a plenary trial on all issues, including causation, as a matter of law and as a matter of fundamental fairness.

Plaintiff's motion for partial summary judgment is therefore denied. A form of order accompanied this opinion.